SECURITY PACIFIC BUSINESS CREDIT, INC., Appellant, v PEAT MARWICK MAIN & Co., as Successor to MAIN HURDMAN et al., Respondent.

First Department, April 30, 1991

**APPEARANCES OF COUNSEL**

*Gabriel B. Schwartz* of counsel *(Anthony C. Acampora* with him on the brief; *Hahn & Hessen,* attorneys), for appellant.

*Mathias E. Mone* of counsel *(Jonathan D. Thier, Timothy R.*

*Dodson, Louis P. Novello* and *Claudia L. Taft* with him on the brief; *Cahill Gordon & Reindel,* attorneys), for respondent.

## OPINION OF THE COURT

KUPFERMAN, J.

We start as we must, as did the IAS court, with the analysis in *Credit Alliance Corp. v Andersen & Co.* (65 NY2d 536, 551): "Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance."

It would seem that from what we know there has been a sufficient showing to require a trial. At the very least, it is too early in the proceeding to grant summary judgment because the plaintiff has not yet had a sufficient opportunity to develop the facts that would prove its case.

The *Credit Alliance* case *(supra)* has been analyzed in *First Natl. Bank of Commerce v Monco Agency* (911 F2d 1053 [5th Cir 1990]) as what is termed a "near privity" rule and we have in this case the functional equivalent of privity. *(European Am. Bank & Trust Co. v Strauhs & Kaye* [companion case to *Credit Alliance],* 65 NY2d 536, 554, *affg* 102 AD2d 776.)

We do not have the problem of lack of nexus. *(See, Iselin & Co. v Mann Judd Landau,* 71 NY2d 420.) Because of a prior relationship, the identity of the substantial lender was known to the accountants and here a subsequent relationship is indicated. *(See, Westpack Banking Corp. v Deschamps,* 66 NY2d 16.)

The borrower was Top Brass, a company engaged in the consumer electronic and appliance business. In 1983, Top Brass had been dealing with the United Mizrachi Bank (hereinafter UMB) to increase its $10 million revolving line of credit to $20 million and, together with the defendant accountants, discussions were held with Bankers Trust Company and plaintiff Security Pacific Business Credit, Inc. (hereinafter SPBC) for this purpose. Clearly, at that time SPBC made

known to the defendant that it would rely on it as to the question of the adequacy of a reserve for uncollectible accounts and the defendant issued an unqualified opinion with respect to Top Brass' financial statement. A note to the financial statement indicated that Top Brass had a preliminary commitment for the new increased line of credit. However, Top Brass did not accept SPBC's offer because it was matched by UMB and Top Brass decided not to change lenders.

Thereafter, in January 1984, as part of a public offering of stock, Top Brass expanded its outlets and, therefore, required a larger line of credit. UMB offered $40 million and Top Brass applied to SPBC for $50 million. This was preliminarily granted subject to further investigation. SPBC's staff again examined Top Brass' books, but awaited the defendant's report for the fiscal year ending June 30, 1984, concerning the adequacy of the 8% reserve for uncollectible accounts receivable.

The defendant's audit team was headed by Douglas J. Freeman, the engagement partner. SPBC's regional manager was Stanley Seiden. Top Brass' president was Alfred Narotzky. Seiden contends that he telephoned Freeman at Narotzky's suggestion and told him that there would be reliance on the accounting opinion when it was finalized. Freeman at his deposition stated as follows: "A. I don't know the date that I became aware of the negotiations with UMB and/or Security Pacific. I can't recall that date. Certainly this memo in the files dated 9/14/84 would indicate to me that on or after that date, I probably would have become aware of it."

In his affidavit, in an attempt to clarify that statement, we have the following: "I do not recall the specific conversation or the specific date whereby I first was made aware of loan negotiations between Top Brass and Security Pacific and/or UMB. However, based upon my review of the work papers, I believe that the negotiations were disclosed to Main Hurdman for the first time during the conducting of Main Hurdman's subsequent events procedures, which procedures * * * are designed to assist Main Hurdman in its review of transactions and events occurring after the balance sheet date (June 30, 1984). According to the Subsequent Events Memo and Subsequent Events Checklist * * * the subsequent events procedures were conducted with respect to Top Brass on or around September 14, 1984. Main Hurdman's opinion with respect to the 1984 Top Brass financial statements is dated September

12, 1984. Since the opinion date reflects the date of completion of field work with respect to an audit * * * I believe that Main Hurdman first became aware of the loan negotiations between Top Brass and Security Pacific (and/or UMB) upon completion or shortly after completion or our audit field work."

Defendant's unqualified accounting opinion was issued September 26, 1984 and, we note that the work papers of the defendant, dated September 14, 1984, aforementioned, specifically named SPBC as negotiating with Top Brass for the credit line. A $50 million credit line was then approved by SPBC on October 4, 1984 and Bankers Trust agreed to participate up to 50% of such amount.

In its next year's report, the defendant for the first time stated that 30% of Top Brass' accounts receivable were uncollectible and that, had it been discovered for the prior year's report, it would have wiped out the company's profit. In August of 1986, Top Brass filed for bankruptcy and the lenders lost approximately $8 million.

Defendant had priority in discovery and it was not until defendant's answer to plaintiff's interrogatories in March of 1989 that the plaintiff learned that all six of the accountants involved in the 1984 audit were no longer employed by the defendant. Defendant provided addresses for only two of them.

Applying the criteria of *Credit Alliance (supra)* the defendant knew the purpose of the financial reports and quite possibly that the plaintiff was relying on them. To the extent that there are any gaps, the plaintiff is entitled to further pretrial discovery before there can be any consideration of a motion for summary judgment.

Accordingly, the order of the Supreme Court, New York County (David Saxe, J.), entered on or about September 5, 1990, and the judgment of said court entered thereon on September 17, 1990, should be reversed, on the law, and the defendant's motion for summary judgment dismissing the complaint should be denied with leave to renew upon the conclusion of all pretrial discovery, without costs.

CARRO, J. P. (dissenting). In this action for damages for accountants' negligence, the Supreme Court properly dismissed the complaint upon defendant's demonstration of the lack of any conduct on its part linking it to plaintiff which would evince the accountants' understanding of plaintiff's reliance, and plaintiff's failure to raise any issue of fact in

that regard *(Credit Alliance Corp. v Andersen & Co.,* 65 NY2d 536, 551).

While there may have been contact between the parties during defendant's audit of Top Brass Enterprises, Inc.'s financial statements for the first quarter of fiscal year 1983-1984 in October and November 1983, in connection with plaintiff's consideration of a $20 million line of credit to Top Brass, that contemplated transaction was not consummated. Over the next nine months, Top Brass continued to utilize the line of credit from its prior lender, did not borrow any funds from the plaintiff, and had no communication with the plaintiff.

The only contact between the parties which is pertinent to the line of credit issued to Top Brass by plaintiff in October 1984, occurred on September 14, 1984, after defendant had completed its fieldwork in connection with its audit of Top Brass' financial statements for the 1983-1984 fiscal year, when plaintiff's regional manager telephoned defendant's engagement partner. In this 10-minute conversation, unsolicited by defendant's representative, plaintiff did not request defendant to perform any work in connection with its review. Defendant's partner's responses to plaintiff's inquiries were limited to generalities that nothing untoward had been uncovered in the course of the audit and that an unqualified opinion would issue, certifying the tentative draft which plaintiff had received from Top Brass itself. This single, isolated and unsolicited contact was insufficient to raise any issue of fact as to a "bond between them so close as to be the functional equivalent of contractual privity" *(Ossining Union Free School Dist. v Anderson LaRocca Anderson,* 73 NY2d 417, 419).

As the Supreme Court trenchantly observed in granting defendant's motion for summary judgment, "if a lender can secure possible loan recourse against a borrower's auditor by the simple act of calling the auditor before advancing a loan and announcing reliance on the auditor's opinion, then every lender's due diligence list will in the future mandate such a telephone call. For the small price of a phone call, the bank would in effect acquire additional loan protection [by] placing the auditor in the role of an insurer or guarantor of loans extended to its clients."

I agree with the majority that further discovery might shed additional light on whether defendant knew the purpose of the financial report and plaintiff's intention to rely on it, but those are merely the first two prerequisites that plaintiff is

required to establish in order to hold the defendant liable. The third is that "there must have been some conduct on the part of the accountants linking them to [the plaintiff], which evinces the accountants' understanding of [the plaintiff's] reliance." *(Credit Alliance Corp. v Andersen & Co., supra,* 65 NY2d, at 551.)

Plaintiff submitted no evidence that defendant had any direct dealings with plaintiff with respect to the line of credit at issue here, except for the 10-minute telephone conversation that occurred after the fieldwork for the audit had been completed. Plaintiff submitted no evidence that defendant had specifically agreed with Top Brass to prepare the report for plaintiff's use or according to plaintiff's requirements, or had specifically agreed with Top Brass to provide plaintiff with a copy of the report or actually did so. In short, there is no evidence of any "word or action" on the part of the defendant directed to plaintiff, or anything in defendant's retainer agreement with Top Brass, which provided the necessary link between them. *(Credit Alliance Corp. v Andersen & Co., supra,* 65 NY2d, at 553-554; *Westpack Banking Corp. v Deschamps,* 66 NY2d 16, 19.)

Here, plaintiff must already be aware of any word or action on the part of defendant directed to plaintiff, and already has defendant's retainer agreement with Top Brass in hand. As further discovery would not assist plaintiff in satisfying the third element of the *Credit Alliance* test, I am of the view that the defendant's motion for summary judgment was properly granted. "To speculate that something might be caught on a fishing expedition provides no basis to postpone decision on the summary judgment [motion] under the authority of CPLR 3212 (subd [f])." *(Auerbach v Bennett,* 47 NY2d 619, 636; *see also, Trails W. v Wolff,* 32 NY2d 207, 221.)

MILONAS and ELLERIN, JJ., concur with KUPFERMAN, J.; CARRO, J. P., and RUBIN, J., dissent in a separate opinion by CARRO, J. P.

Order, Supreme Court, New York County, entered on or about September 5, 1990, and a judgment of said court entered thereon on September 17, 1990, are reversed, on the law, and the defendant's motion for summary judgment dismissing the complaint denied with leave to renew upon the conclusion of all pretrial discovery, without costs.