79 N.Y.2d 695 (1992)
Security Pacific Business Credit, Inc., Respondent,
v.
Peat Marwick Main & Co., as Successor to Main Hurdman and KMG Main Hurdman, Appellant.
Court of Appeals of the State of New York.
Argued April 29, 1992.
Decided July 1, 1992.
Mathias E. Mone, Jonathan D. Thier, Leonard P. Novello and Claudia L. Taft for appellant.
Gabriel B. Schwartz and Anthony C. Acampora for respondent.
Louis A. Craco and John J. Halloran, Jr., for American Institute of Certified Public Accountants, amicus curiae.
Steven B. Rosenfeld, Gidon M. Caine and Glenda G. Grace for New York State Bankers Association and others, amici curiae.
Dan L. Goldwasser, John C. Grosz and Michael J. Crisafulli for New York State Society of Certified Public Accountants, amicus curiae.
Chief Judge WACHTLER and Judges SIMONS, KAYE and TITONE concur with Judge BELLACOSA; Judge HANCOCK, JR., dissents and votes to affirm in a separate opinion.
*698 BELLACOSA, J.
Plaintiff, an institutional lender lacking a contractual or other direct business relationship with defendant accounting firm, seeks to hold the defendant liable for alleged negligence committed by defendant's predecessor in its 1984 audit of financial statements of its client, Top Brass Enterprises, Inc. (Top Brass). In October 1984, plaintiff, Security Pacific Business Credit, Inc. (SPBC), an asset based lender, and Bankers Trust Co.[*] loaned Top Brass approximately $40 million on a $50 million line of credit, secured by Top Brass's accounts receivable and merchandise inventory. After Top Brass filed for bankruptcy in 1986, SPBC sued defendant Peat Marwick Main & Co., as successor to Main Hurdman. SPBC alleged that it had relied on Main Hurdman's 1984 unqualified audit opinion and financial statements, which did not accurately present the financial position of Top Brass in that they negligently over-valued Top Brass's accounts receivable and merchandise *699 inventory. SPBC's alleged reliance is premised essentially on a telephone call from its vice-president, Seiden, to Main Hurdman's audit partner, Freeman, during and with respect only to the 1984 audit process and audit work papers supplied to SPBC by Top Brass. SPBC claimed losses on the loans of at least $8 million.
The issue presented is whether defendant accountants may be held liable in negligence by application of the principles of the Credit Alliance Corp. v Andersen & Co. (65 N.Y.2d 536) line of precedents. We conclude that SPBC failed to demonstrate the existence of a relationship between itself and defendant's predecessor accounting firm "sufficiently approaching privity" (id., at 553; see also, id., at 546, 550, 554) and, therefore, we reverse the order of the Appellate Division and grant defendant summary judgment dismissing the complaint.

I.
Top Brass, a publicly owned retailing chain, retained Main Hurdman, a national accounting firm, to audit its financial statements and issue an independent audit opinion for fiscal years 1983, 1984 and 1985. In 1983, when Top Brass was seeking an increased $20 million line of credit, Main Hurdman assisted it in negotiating with several lenders, including SPBC. SPBC alleges that its vice-president, Seiden, informed Main Hurdman that it would be relying on Main Hurdman's first quarter 1984 audit opinion in considering Top Brass's 1983 line of credit application, and that an unnamed Main Hurdman employee made assurances to Seiden about its 1983 audit findings. SPBC's proposal for such a loan was ultimately not accepted when Top Brass's lender at that time was able to meet Top Brass's lending needs. Those independent dealings are irrelevant to the matter before us because the heart of this lawsuit between SPBC and Peat Marwick relates solely to Main Hurdman's 1984 audit opinion prepared for Top Brass.
In 1984, Top Brass sought a new $50 million line of credit and on July 30, 1984, SPBC issued a preliminary proposal letter to Top Brass in response to the request, subject to SPBC's confirmation of Top Brass's financial condition. SPBC conducted its own independent examination of Top Brass's books to assess its accounts receivable; however, SPBC's credit review staff did not contact Main Hurdman's personnel during the review and were not directed to do so. According to Seiden, SPBC thereafter advised Top Brass that final approval *700 of the line of credit was conditioned on Main Hurdman's 1984 audit opinion. There is no evidence in the record that SPBC or Top Brass also notified Main Hurdman of this, or of any direct contact between the parties during that preaudit period.
Main Hurdman's audit team, headed by audit partner Douglas Freeman, conducted its audit field work from August 20 to September 12-13, 1984. Main Hurdman's "Engagement Letter" to Top Brass dated August 20, 1984 indicated that the "purpose and scope" of the audit of Top Brass's 1984 financial statements were "to express an opinion on [its] consolidated financial statements". It made no mention of SPBC, loan negotiations, or of any other uses or potential uses of the audit opinion. The proof in the record that Main Hurdman was aware during the audit that Top Brass was negotiating for a loan is limited to (1) a reference in a preliminary balance sheet ("Pencil Draft"); (2) Main Hurdman's September 14, 1984 "Subsequent Events Memo", prepared by its auditors after the field work was complete, indicating that Top Brass was then "currently negotiating for a revolving line of credit of at least $40 million * * * with [United Mizrachi Bank] and/or Security Pacific * * * to be secured by accounts receivable" (emphasis added); and (3) the minutes of Top Brass's Board of Directors meeting of June 30, 1984.
According to Seiden, upon his receipt on September 13 from Top Brass of the 1984 draft financial statements and audit opinion, he made a telephone call to Main Hurdman's audit partner, Freeman, to discuss the audit report, at the suggestion of Top Brass officers. The date and substance of that phone call are uncertain. SPBC contends in its complaint that the call was made prior to September 12, 1984, the date of defendant's 1984 audit opinion. SPBC's Seiden contends the call was made after September 13 but before September 17, during the period he was drafting a "Credit Committee Recommendation" (CCR) to SPBC's Credit Committee, recommending approval of Top Brass's loan request. Freeman did not have any recollection of that phone call or any call from Seiden, but defendant conceded for purposes of summary judgment that a telephone call had occurred. That call constitutes the linchpin of plaintiff's claim.
According to Seiden's recollection of that phone conversation, Freeman indicated in response to Seiden's questions that he was aware of the ongoing negotiations between Top Brass and SPBC for a line of credit; that the income figure in the *701 1984 audit report would be the same as that in the draft audit report; that there would be no qualifications in the audit opinion; that Top Brass's system for retaining adequate reserves was "under control"; and that the firm had not uncovered anything that a lender should know that was not reflected in the draft audit report. Seiden informed Freeman that SPBC would be relying on the audit report, and would be approving the loan based on the collectability of accounts receivable and over-all profitability. By Seiden's own account, Freeman responded to his inquiries with "those general kind of responses that they've done the job, and they've done their work, and they were comfortable with the fact that they were issuing an * * * unqualified opinion". Seiden did not ask Freeman to do anything specific for SPBC and did not make any notes of that phone call. The record does not indicate any other or further contacts between SPBC and Main Hurdman before SPBC approved the loan to Top Brass on October 8, 1984.
Seiden testified that in making the approval recommendation in the CCR, he relied on the tentative draft sent by Top Brass and on the general assurances he claimed Freeman had given him during that phone call. However, the loan recommendation made no reference to the 1984 audit, to Main Hurdman, or to the telephone call. Also, Seiden's deposition testimony demonstrates that the CCR loan approval recommendation was already "in its circulation stage" when he telephoned Freeman. This summary constitutes the controlling record and facts in the analysis resolving this litigation, notwithstanding the expansive inferences employed in the dissenting opinion.
Main Hurdman's unqualified 1984 audit opinion of September 12, 1984, the date the field work was completed, was issued to Top Brass on September 26, 1984 and was filed with the Securities Exchange Commission pursuant to the annual filing requirements for publicly held corporations. Top Brass thereafter sent SPBC a copy of the publicly filed report. SPBC and Bankers Trust subsequently granted Top Brass the $50 million line of credit it had sought.
In its 1985 audit report, defendant indicated for the first time that 30% of Top Brass's accounts receivable were uncollectible. As SPBC's expert reported, had this been discovered for the prior year's report, it would have nullified Top Brass's profit and the report would instead have reflected a substantial loss. In August of 1986, Top Brass filed for bankruptcy.
*702 SPBC sued Peat Marwick, alleging that it relied on Main Hurdman's 1984 unqualified audit opinion which negligently indicated that Top Brass's financial statements accurately reflected its financial condition, and that Main Hurdman was aware of SPBC's intended reliance before it completed its 1984 audit. Defendant Peat Marwick denied these allegations in its answer, asserted several affirmative defenses, and thereafter moved for summary judgment. Supreme Court granted the motion dismissing the complaint, holding that insufficient evidence existed "to create a triable issue of fact as to Main Hurdman's awareness of SPBC's reliance on its audit report and as to linking conduct on the part of Main Hurdman." A divided Appellate Division reversed, denying summary judgment to defendant with leave to renew upon conclusion of all pretrial discovery (165 AD2d 622). The Appellate Division granted leave to appeal on a certified question. We now reverse and reinstate Supreme Court's grant of summary judgment to defendant dismissing the complaint. Plaintiff having failed to satisfy CPLR 3212 (f) and there being no triable issues of material fact, defendant was properly awarded summary judgment by the trial court.

II.
When accountants conduct a traditional financial audit, they undertake a duty of due care in the performance of their engagement to the party which has contracted for their services (Iselin & Co. v Mann Judd Landau, 71 N.Y.2d 420). In "carefully circumscribed" instances (id., at 425), accountants may also incur liability to injured third parties who rely on their work, even in the absence of a direct contractual relationship between the accountants and the third party. This Court established an analytical framework for determining the applicability of this policy-based extension of common-law liability in Credit Alliance Corp. v Andersen & Co. (65 N.Y.2d 536, supra): "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance" (id., at 551). The indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or *703 bond with the once-removed accountants "sufficiently approaching privity" based on "some conduct on the part of the accountants" (Westpac Banking Corp. v Deschamps, 66 N.Y.2d 16, 19; see, Credit Alliance Corp. v Andersen & Co., supra, at 550-553; Iselin & Co. v Mann Judd Landau, 71 N.Y.2d 420, 425, supra; Ultramares Corp. v Touche, 255 N.Y. 170, 182-183).
Significantly, the Court in Credit Alliance also expressly emphasized that while the newly articulated criteria "permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principles articulated in Ultramares [supra], Glanzer [v Shepard (233 N.Y. 236)] and White [v Guarente (43 N.Y.2d 356)], but, rather, they are intended to preserve the wisdom and policy set forth therein." (Credit Alliance Corp. v Andersen & Co., supra, at 551 [emphasis added].)
In Credit Alliance Corp. v Andersen & Co. (65 N.Y.2d 536, supra), we declared that a defendant accounting firm, Andersen & Co., was not liable to a noncontracting party-plaintiff, Credit Alliance Corp., which had loaned money to Andersen's client in reliance on Andersen's erroneous audit report of the client's financial statements, which the client had supplied to Credit Alliance. While Credit Alliance alleged that Andersen knew or should have known that its client was showing the audit reports to Credit Alliance to induce reliance, the Court determined that Credit Alliance failed to demonstrate the existence of a relationship between Andersen and Credit Alliance "sufficiently approaching privity". The Court emphasized that Andersen had not been retained by its client for the particular purpose of inducing Credit Alliance to extend the client credit; had not had any direct dealings with Credit Alliance; had not specifically agreed with its client to prepare the audit report for Credit Alliance's use or according to its requirements; had not specifically agreed with its client to provide Credit Alliance with a copy of its audit report or actually did so; and had not directed any words or action toward Credit Alliance to establish the necessary link with it (Credit Alliance Corp. v Andersen & Co., id., at 553-554; see also, Westpac Banking Corp. v Deschamps, 66 N.Y.2d 16, 19, supra).
European Am. Bank & Trust Co. v Strauhs & Kaye (65 N.Y.2d 536), decided as a companion, complementary case to Credit Alliance, resulted in a ruling not to dismiss the noncontracting plaintiff lender European American Bank's complaint *704 against the defendant accounting firm Strauhs & Kaye. The Court held that the allegations in the complaint and affidavit "posit a direct nexus between the parties" (id., at 545 [emphasis added]). That "direct nexus" consisted of the "parties' direct communications and personal meetings" (id., at 554; see, Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 N.Y.2d 417, 425-426). The facts, as alleged by European American Bank, "clearly show[ed] that [Strauhs & Kaye] was well aware that a primary, if not the exclusive, end and aim of auditing its client * * * was to provide [European American Bank] with the financial information it required" (European Am. Bank & Trust Co. v Strauhs & Kaye, supra, at 554 [emphasis in original]). European American Bank had alleged that Strauhs & Kaye was aware of the "particular purpose for their services and certain conduct on their part creating an unmistakable relationship with the reliant plaintiff. It [was] unambiguously claimed that the parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of [European American Bank's] lending relationship with Majestic Electro, for the very purpose of discussing [Majestic's] financial condition and [European American Bank's] need for [Strauhs & Kaye's] evaluation" (id., at 554 [emphasis added]). Further, Strauhs & Kaye's representatives made repeated personal representations to European American Bank concerning Majestic's assets. The dissenting opinion studiously avoids the language and impact of European American and its important place in the chronological sequence of precedents governing this field of law.

III.
Applying the precedents and principles to this case, we conclude that on this record plaintiff has failed to make the necessary demonstration of the existence of a relationship between the parties to this litigation "sufficiently approaching privity". In opposing Peat Marwick's motion for summary judgment, SPBC was required to produce evidentiary proof, in admissible form, of all three elements of the Credit Alliance analysis, warranting a trial on material questions of fact (see, Iselin & Co. v Mann Judd Landau, 71 N.Y.2d 420, 425, supra; Zuckerman v City of New York, 49 N.Y.2d 557). It has failed to meet its burden.
In opposing summary judgment, SPBC relies on evidence *705 indicating that Main Hurdman was aware, before it issued its 1984 unqualified audit report, that SPBC and Top Brass were involved in negotiations for a line of credit to be secured by accounts receivable. To establish a relationship sufficiently approaching privity, particularly the indispensable linking conduct on which the parties heavily focus, SPBC primarily relies on the single phone call. It was allegedly placed by SPBC's vice-president, Seiden, to Main Hurdman's audit partner, Freeman, at Top Brass's suggestion, with respect only to the 1984 audit. SPBC also relies on Main Hurdman's knowledge acquired from its own 1984 audit work papers. Notwithstanding the dissenting opinion's halving of the analysis by concentrating only on aspects of Main Hurdman's knowledge, and its dispensing with the concomitant conduct ingredient that must also be attributable to Main Hurdman in order to hold it liable, SPBC's evidence, for summary judgment purposes, falls short of the Credit Alliance criteria.
The fact pattern of European American offers a cogent contrasting illustration. There, the accountants had multiple, direct and substantive communications and personal meetings with the relying lender during the entire course of the lending relationship. Here, SPBC's claimed relationship to Main Hurdman, "sufficiently approaching privity", rises or falls essentially on the single unsolicited phone call. We conclude that the relationship fails to connect because Main Hurdman's partner's responses to SPBC's inquiries in that single call placed after the audit field work was completed were, viewed even in the most favorable light plaintiff places on them, "limited to generalities that nothing untoward had been uncovered in the course of the audit and that an unqualified opinion would issue, certifying the tentative draft which plaintiff had received from Top Brass itself" (Security Pac. Business Credit v Peat Marwick Main & Co., 165 AD2d 622, 626). SPBC's efforts to elevate these facts to the critical rank and linking relationship akin to privity, as our precedents require, are unavailing. SPBC cannot unilaterally create such an extraordinary obligation, imposing negligence liability of significant commercial dimension and consequences by merely interposing and announcing its reliance in this fashion.
Moreover, no sufficient conduct appears in this record evidencing a relationship between SPBC and the accountants, which Credit Alliance contemplates. In this respect, the dissent would substantially extend Credit Alliance by allowing any conduct by the accountants to result in a potential for *706 liability. This plainly is not what Credit Alliance and its related precedents effected. As the Supreme Court observed in granting defendant's motion for summary judgment in this case, "if a lender can secure possible loan recourse against a borrower's auditor by the simple act of calling the auditor before advancing a loan and announcing reliance on the auditor's opinion, then every lender's due diligence list will in the future mandate such a telephone call. For the small price of a phone call, the bank would in effect acquire additional loan protection [by] placing the auditor in the role of an insurer or guarantor of loans extended to [its] clients." The facile acquisition of deep pocket surety coverage, with no opportunity for actuarial assessment and self-protection, by the party sought to be charged, at the mere cost of a telephone call by the lender, is a bargain premium rate indeed. This, too, was surely not within the ambit of liability promulgated and recognized in Credit Alliance.
As exemplified in many of this Court's precedents, in contradistinction to plaintiff's allegations here, no claim is made and no evidence is tendered that Main Hurdman was retained to prepare the audit report for the purpose of inducing SPBC to extend credit to Top Brass, or that Main Hurdman ever specifically agreed with Top Brass to prepare the report for SPBC's use or according to SPBC's requirements (Credit Alliance Corp. v Andersen & Co., 65 N.Y.2d 536, 553-554, supra; see, Iselin & Co. v Mann Judd Landau, 71 N.Y.2d 420, 426-427, supra; and Westpac Banking Corp. v Deschamps, 66 N.Y.2d 16, 19, supra). While those features are not exclusive prerequisites to satisfy the Credit Alliance analysis, they provide confident and significant foundational support, which this Court has previously recognized and, therefore, appropriately now considers in deciding this case.
Also, there is no evidence that Main Hurdman shaped its 1984 audit opinion to meet any needs of SPBC. Neither is there any claim or proof that Main Hurdman directly supplied SPBC with a copy of the audit report or opinion or ever agreed to do so (compare, Credit Alliance Corp. v Andersen & Co., supra, at 553; and Westpac Banking Corp. v Deschamps, supra, at 19, with Glanzer v Shepard, 233 N.Y. 236, 239). Indeed, the record shows that Main Hurdman's client, Top Brass, sent SPBC the report only after it was publicly filed with the SEC. Similarly, the audit engagement letter between Top Brass and Main Hurdman does not mention SPBC or provide or suggest the necessary link to SPBC (see, Credit Alliance Corp. v Andersen & Co., supra, at 554). *707 To be sure also, there is no claim that Main Hurdman was aware that "a [emphasis added] primary, if not the exclusive, end and aim [emphasis in original] of auditing its client [Top Brass] was to provide [SPBC] with the financial information it required" (European Am. Bank & Trust Co. v Strauhs & Kaye, 65 N.Y.2d 536, 554, supra). These observations are also not new and do not carry the definite article that the dissenting opinion emphasizes in order to knock down its strawperson argument (dissenting opn, at 717-719). In fact, the record indicates that the primary, if not exclusive, end and aim of the Main Hurdman audit was for use in Top Brass's audit report as required by Federal law for a publicly held company. While Main Hurdman knew the identity of the specific party, SPBC, the complaint and supporting documents fail to allege or demonstrate Main Hurdman's awareness of any other "particular purpose" for their services, or conduct on the part of Main Hurdman creating an "unmistakable relationship" with SPBC (cf., European Am. Bank & Trust Co. v Strauhs & Kaye, supra, at 554). Finally, the evidence of the contacts and discussions between Main Hurdman and SPBC with regard to the 1983 proposed $20 million line of credit cannot bridge the chasm between SPBC and Main Hurdman with respect to the 1984 audit report (see, Credit Alliance Corp. v Andersen & Co., supra; Westpac Banking Corp. v Deschamps, 66 N.Y.2d 16, 19, supra). These illustrations have been presented for what they are  nonexclusive types of activity recognized and considered in this Court's prior cases to evaluate whether a relationship "sufficiently approaches privity". They are self-evidently not newly minted curtailments of the type of conduct that demonstrates third-party assumption of responsibility under the Credit Alliance analysis.
The dissenting opinion has also made other assertions which require a brief additional response lest there be misunderstanding of the Court's analysis, meaning and holding in this case. First, we do not accept the mischaracterization of our application of the Credit Alliance test and related precedents (dissenting opn, at 708-709, 717-719). These precedents specifically retain a key requirement of linkage "sufficiently approaching privity". Moreover, the authoritative sources from which the Court derives the meaning and application of that phrase in this case are its own recent controlling precedents, which "do not represent a departure from the principles articulated in Ultramares, Glanzer, and White but, rather * * * are intended *708 to preserve the wisdom and policy set forth therein." (Credit Alliance Corp. v Andersen & Co., 65 NY2d, at 551, supra.) It is particularly unnecessary to engage the dissenting opinion on its use of Federal lower court interpretations of New York substantive common law in this area (dissenting opn, at 715, 719-720), because this Court's precedents are the best evidence of this State's common law and serve as the sole guiding and controlling basis for the Court's decision today.
In sum, Main Hurdman's audit work was clearly for the benefit of its client, Top Brass, as a "convenient instrumentality for use in the development of [its] business, and only incidentally or collaterally for the use of those to whom [Top Brass] might exhibit it thereafter" (Ultramares Corp. v Touche, 255 NY, at 183, supra, cf., Glanzer v Shepard, 233 N.Y. 236, supra). Only recently this Court reaffirmed the principle that the duty to noncontractual third parties is defined "narrowly" (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 N.Y.2d 417, 424-425, supra). We have declined to adopt the broad-brush transformation of the liability formula espoused by the dissenting opinion, because such an extension of liability to noncontracting parties is "unwise as a matter of policy * * * or, at the least, a matter for legislative rather than judicial reform" (id., at 425; see, Credit Alliance Corp. v Andersen & Co., 65 N.Y.2d 536, 553, n 11, supra). The Court thus appropriately adheres to its settled rejection of the dissenting opinion's interwoven implication that sweeping liability should be newly and involuntarily imposed on the entire accounting industry by the simple act of lenders communicating their reliance in the manner promoted in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendant's motion for summary judgment dismissing the complaint granted, and the certified question answered in the negative.
HANCOCK, JR., J. (dissenting).
In its decision today, the Court adopts a new rule to govern accountants' liability for negligent misrepresentation. By holding that plaintiff has not made a sufficient factual showing to survive defendant's motion for summary judgment, the majority reimposes the stringent privity rule of Glanzer v Shepard (233 N.Y. 236) and Ultramares Corp. v Touche (255 N.Y. 170). It departs from what until now has been the less restrictive rule of White v Guarente (43 N.Y.2d 356) and Credit Alliance Corp. v Andersen & Co. (65 N.Y.2d 536, 551), *709 and erects one of the most forbidding legal barriers in the country to accountants' liability. I, therefore, respectfully dissent.
Two points must be understood: (1) only the last of the three Credit Alliance elements is in issue  i.e., whether there has been "some conduct on the part of the accountants linking them to [plaintiff], which evinces the accountants' understanding of [the plaintiff's] reliance" (id., at 551); and, (2) because this is a motion for summary judgment dismissing the complaint, plaintiff need not prove "linking conduct" but only make a sufficient showing to establish a triable issue of fact (see, Sillman v Twentieth Century-Fox Film Corp., 3 N.Y.2d 395, 404).
It is significant that none of the accountants conducting the audit was still employed by Main Hurdman when the action was commenced. Because the motion court declined to allow the depositions of these accountants, SPBC has not had the benefit of the testimony of those directly involved in the 1984 audit. Despite this, the serious factual issues raised by plaintiff's moving papers demonstrate that depriving it of any chance to prove its case directly conflicts with established summary judgment law and with what until today has been the rule under Credit Alliance. This case, by no means, turns only on "the single phone call" (majority opn, at 705) made by "SPBC's vice-president, Seiden, to Main Hurdman's audit partner, Freeman" (id.), important though that call was. As will be apparent from the summary which follows, the phone call is only part of the "linking conduct" clearly evincing Main Hurdman's knowledge of SPBC's reliance.

I
The parties involved in this lawsuit are three: the accounting firm, Main Hurdman, which was allegedly negligent in preparing and certifying its client's 1984 financial statement; Main Hurdman's client, Top Brass, whose statements were audited; and the plaintiff, SPBC, a commercial lender which made loans to Top Brass on the security of its accounts receivable and inventory. The credit was allegedly extended in reliance on representations made by the accountants in their audit of the Top Brass statements.
The critical events occurred between August 20, 1984 when Main Hurdman commenced its field work for the 1984 audit and early October 1984 when SPBC, in reliance on Main *710 Hurdman's representations, completed its final approval process and began to advance funds. Of particular significance as conduct evincing Main Hurdman's knowledge of SPBC's intended reliance on its representations is the telephone call on September 14 made by Stephen Seiden of SPBC, at the request of Top Brass, to Douglas Freeman, the Main Hurdman auditing partner. In this phone call, Freeman gave oral assurances to Seiden concerning the reliability of the accounts receivable figure, the adequacy of the reserve for bad accounts, and the accuracy of the 1984 income figures as set forth in the then uncertified tentative audit draft.
The 1984 dealings were not the first credit negotiations between SPBC and Top Brass in which Main Hurdman had had a role. In the fall of 1983, SPBC had made a similar proposal for an extension of a $20 million line of credit to Top Brass to be secured, as in 1984, by accounts receivable and inventory. This proposal was ultimately rejected in December 1983 when Top Brass decided to make no change in its financing arrangements. However, during these negotiations SPBC's Seiden discussed the figures shown in the Top Brass first quarter 1984 audit prepared by Main Hurdman with one of the Main Hurdman auditors. Main Hurdman was advised that SPBC had a specific concern with the accounts receivable and that it would be relying on Main Hurdman's opinion as to the adequacy of the accounts receivable reserve.[1] When Top Brass ultimately decided not to accept SPBC's proposal, it stated that it wanted to maintain its contact with SPBC for possible borrowing in the near future and sent SPBC a copy of the Main Hurdman 1984 first quarter final audit.
Negotiations between SPBC and Top Brass resumed again in July of 1984 when Top Brass, having substantially increased its business, needed a $50 million line of credit. At the end of July, Seiden made Top Brass a proposal for the $50 million credit, conditioned on SPBC's satisfaction with Top *711 Brass' capital, earnings, and accounts receivable. Top Brass was advised that no final approval would be given until SPBC received Main Hurdman's opinion as to its 1984 financial statements and the adequacy of the uncollectible accounts reserve.
When Main Hurdman commenced its auditing of Top Brass' 1984 statements on August 20, 1984, it knew of Top Brass' new negotiations with SPBC for the $50 million line of credit. Among the "initial procedures" itemized in the August 20, 1984 Audit Planning Checklist is "[d]iscussion with client officials to establish an understanding of the engagement, and to obtain information about business developments that might affect the engagement".[2] Main Hurdman's "1984 Audit Program"  drafted early in the audit process  provided that Main Hurdman "[r]eview authorizations in corporate minutes or other appropriate authoritative documentation for additions to debt". Main Hurdman had received the minutes of the Top Brass directors' meetings which noted the directors' authorization to negotiate a line of credit with SPBC. A Main Hurdman memorandum concerning the minutes specifically refers to the directors' authorization for negotiations with SPBC as "an item of note".[3] The "pencil draft" of the 1984 balance sheet, sent to Main Hurdman by Top Brass and prepared by the Top Brass controller (who had been a Main Hurdman auditor during Top Brass first quarter audit), bore a notation reflecting Top Brass' negotiations for "at least $40 million to replace the existing $20 million line of credit * * * [to] be secured by accounts receivable" (emphasis added).[4] In its planning memorandum in preparation for the auditing *712 process, Main Hurdman took particular note of the concern expressed in 1983 over the doubtful accounts reserve. The memorandum stated that based upon their experience in 1983,[5] accounts receivable were "to be thoroughly reviewed, with careful attention to be given to delinquent accounts, collectability and the provision for doubtful accounts" (emphasis added).
Main Hurdman completed its field work on September 12. The next day, Top Brass sent SPBC a copy of its 1984 financial statement and a draft of Main Hurdman's audit opinions stamped "tentative draft subject to adjustment." Main Hurdman's draft recited that Top Brass was negotiating a line of credit for at least $40 million to be secured by accounts receivable. When he received the Main Hurdman draft, Seiden told Top Brass that SPBC would not make a final decision on the credit extension until it received Main Hurdman's final report and opinion. Top Brass advised Seiden that the Main Hurdman final report would be the same as the tentative draft and that its audit opinion would be unqualified.
To verify these statements and to assure SPBC of the tentative draft's reliability, Top Brass requested that Seiden telephone Freeman at Main Hurdman. By this time, as has been shown, Main Hurdman and Freeman, in particular, were well aware of the SPBC $50 million line of credit proposal. Indeed, Freeman had drafted the Main Hurdman "subsequent events memo" which noted that "the client currently is negotiating for revolving line of credit of at least $40 million  this is to replace the current line of credit of $20 million  this is being negotiated with UMB and/or Security Pacific and is to be secured by accounts receivable" (emphasis added).[6] Top Brass told Seiden that Freeman knew of SPBC's intended *713 reliance on the audit, that Freeman was expecting SPBC to call and that he would answer any question SPBC had.
On September 14, 1984 Seiden telephoned Freeman. Seiden asked about the financial statement and specifically about the doubtful accounts reserve fund.[7] Seiden told Freeman in "no uncertain terms that [the audit report] was a very important document" and "that the numbers that were presented thereon, especially the profitability of the company and the collectability of the receivables were the basis on which we were approving the deal" (see, record on appeal [emphasis added]). In response to Seiden's question as to whether "there was anything in his examination that would lead anyone to believe that the company didn't make $8-½ million in 1984, or thereabouts" Freeman said that "that income figure was a number that they were certifying to and had done their due diligence and were satisfied with issuing a statement based on it, that there would be no qualifications in the opinion letter" (emphasis added).
In early September of 1984, Bankers Trust had been invited to participate in extending the line of credit to Top Brass. Based on Freeman's assurances to Seiden that the Main Hurdman tentative audit report was accurate and would shortly be certified without material changes, Seiden prepared and signed the Credit Committee Recommendation for the $50 million line of credit and the extension of credit was conditionally approved both by SPBC and Bankers Trust. After receipt of Main Hurdman's final written opinion in October 1984, both Bankers Trust and SPBC completed their approval processes and commenced dispersing the loans.

*714 II.
A. Credit Alliance is Satisfied Here.
The criteria for accountant liability to a noncontractual third party are well established. Such liability, as the majority repeatedly reminds us, is closely circumscribed; but, in our decisions since White v Guarente (supra), we have emphasized that "the court has [not] erected a citadel of privity for negligent misrepresentation suits" (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 N.Y.2d 417, 424). Instead, the Court has adopted a description of the circumstances which exist when liability may be established, i.e., "a relationship [between the parties] so close as to approach that of privity" (id., at 424). Until Credit Alliance, the tests of when the relationship sufficiently approaches privity were articulated in "various ways" (id., at 425). But, as we stated in Ossining:
"Most recently, in Credit Alliance, we spelled out the following criteria for liability: (1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance (Credit Alliance Corp. v Andersen & Co., 65 NY2d, at 551)" (id., at 425 [emphasis added]).
The standardized definition of privity articulated by the three Credit Alliance requirements thus replaced the various tests previously applied and imparted uniformity to the area of accountant liability.
There is no dispute that the first two criteria of Credit Alliance are satisfied. There is ample proof that well before the September 14 conversation between Seiden and Freeman, Main Hurdman knew that the audit was to be used for the credit negotiations and that SPBC would rely on its audit report and opinion. The minutes of the 1983 and 1984 Top Brass director's meetings authorizing credit negotiations, the audit planning memo, the pencil draft, and the tentative draft of the audit report all indicate that Main Hurdman had this knowledge from the outset of the audit. The only issue is whether, for purposes of avoiding summary judgment, the record contains enough evidence of "linking conduct" to satisfy the third criterion of Credit Alliance. As will be shown, there is ample evidence to create a factual issue on this third *715 criterion and, hence, the Credit Alliance test for a relationship sufficiently approaching privity is satisfied, at least for the purposes of avoiding summary judgment.
The "linking conduct" prerequisite as framed in Credit Alliance is that there be some showing of conduct or contacts between the accountants and the relying third party "which evinces the accountants' understanding of that party['s] * * * reliance" (65 NY2d, at 551, supra [emphasis added]). Since Credit Alliance, no New York decision, including today's opinion, has attempted to explain what is meant by conduct evincing an accountant's understanding of a third party's reliance.[8] The language of the Credit Alliance opinion suggests that what is called for is an evidentiary showing of some communication or contacts demonstrating the accountant's awareness of the third party's reliance. Indeed, this is how other courts have read Credit Alliance. As one court put it, the requirement is "that the accountants manifest conduct underscoring their understanding of a particular nonclient's reliance upon the work product" (First Natl. Bank of Commerce v Monco Agency, 911 F.2d 1053, 1059 [5th Cir]). Another court has said that touchstone of the inquiry "is not * * * formal direct communication, but rather some link of the `defendant to plaintiff which evinces defendant's understanding of plaintiff's reliance'" (Huang v Sentinel Govt. Sec., 709 F Supp 1290, 1298). If, as the language of Credit Alliance indicates, what is required is a demonstration of some conduct evincing or underscoring the accountant's knowledge of the reliance, then it seems self-evident that there is enough here to withstand summary judgment.
Of the several incidents of "linking conduct", the telephone conversation on September 14, 1984 between Seiden and Freeman is unquestionably the most telling. Seiden's phone call, one that Freeman expected, was placed at the request of Top Brass. What conduct on the part of accountants could more surely link them to their client's prospective lender and "evince" their understanding of the lender's reliance than a conversation in which the lender informs the accountants of its intended reliance on the client's financial condition as stated in the financial statements then under audit and asks for and receives the accountants' assurances of the statements' accuracy?
*716 Despite the Court's efforts to make it seem so, this phone call was not just some last minute stratagem to procure "deep pocket surety coverage" (majority opn, at 707) for the small "cost of a phone call" (id.). Seiden's call to Freeman was at Top Brass' request. A telephone call between a prospective lender and a prospective borrower's accountants  requested by the borrower for the express purpose of having the accountants assure the lender of the soundness of the client's financial position so as to induce the loan  can hardly be passed off as a cheap stratagem of the lender.
But, the September 14 conversation is only a part of the evidence. Other actions by Main Hurdman point unequivocally to its understanding of SPBC's intended reliance on the audit: e.g., Main Hurdman's preparation and circulation of the audit planning memo referring to the previous year's experience and the need for careful attention to delinquent accounts; its receipt and acknowledgment of the Top Brass directors' minutes authorizing the credit negotiations with SPBC; its receipt and consideration of the "pencil draft" noting the credit negotiations in planning the 1984 audit; and its reference in the subsequent events memo to the SPBC credit negotiations as an item to be considered. Despite the majority's persistent disavowals (see, majority opn, at 704, 705), all of this is conduct evincing Main Hurdman's understanding  from the very earliest stages of the audit process  of SPBC's intended reliance on the audit and of its specific concern with the adequacy of the doubtful accounts reserve.
More conduct should certainly not be needed to evince Main Hurdman's knowledge of SPBC's reliance, but there is more  the contacts in late 1983 between Main Hurdman and SPBC concerning SPBC's unsuccessful credit proposal to Top Brass. Main Hurdman knew that its audit of the first quarter 1984 accounts receivable and bad accounts reserve was central to SPBC's proposal. In his December 1983 conversation with the Main Hurdman auditor-in-charge, Seiden had emphasized his concern with the accounts receivable reserve and had specifically advised Main Hurdman that SPBC would rely on Main Hurdman's audit of Top Brass in making its credit proposal (see, supra, at 710, n 1). It is not likely that Main Hurdman would have forgotten SPBC's concern with its client's receivables and SPBC's stated intention to rely on their audit when, only a few months later, their client again sought a line of credit from the identical lender, SPBC.
*717 In sum, the issue in this case could not be more clearly focused because there is no dispute that SPBC has met the first two parts of the Credit Alliance test. The critical elements of SPBC's reliance on the audit in making its credit decision and Main Hurdman's awareness of that reliance are conceded. If what Credit Alliance requires for the third element is a showing of some additional evidence of conduct evincing or underscoring the conceded fact of Main Hurdman's knowledge of SPBC's reliance, then it seems almost inconceivable that this record could be insufficient to create a triable issue on that third element. But, the Court holds that it is not enough. In granting summary judgment, it has evidently concluded that what Credit Alliance demands is not conduct evincing defendant's knowledge of the plaintiff's reliance but instead a showing of an "unmistakable relationship" equivalent to that in European Am. Bank & Trust Co. v Strauhs & Kaye (65 N.Y.2d 536, 554), and one of such closeness or intimacy as to satisfy the privity requirements of Glanzer and Ultramares.
B. The Court's New Rule for Accountants' Liability.
The Court grants summary judgment to the defendant for essentially two reasons: that use of the audit by SPBC was not the exclusive end and aim of the audit (majority opn, at 704, 707); and that Main Hurdman's conduct does not "creat[e] an `unmistakable relationship' with SPBC" (majority opn, at 707). SPBC's evidence of linking conduct, detailed above (supra, II [A]), is simply rejected as being insufficient to satisfy the majority's "unmistakable relationship" requirement.
The Court provides no definition of "linking conduct" other than that set forth in Credit Alliance (65 NY2d, at 551) and offers no explanation of what it requires as conduct evincing defendant's understanding of plaintiff's reliance. It does, however, furnish some instructive clues as to the sort of conduct that would meet its test by pointing out what plaintiff has not shown here. For example, the Court stresses that plaintiff has submitted no proof that: Main Hurdman "shaped its 1984 audit opinion to meet any needs of SPBC" (majority opn, at 706); or that Top Brass retained Main Hurdman "to prepare the audit report for the purpose of inducing SPBC to extend credit to Top Brass"; or that Main Hurdman "ever specifically agreed with Top Brass to prepare the report for SPBC's use or according to SPBC's requirements" (majority opn, at 706). The Court's emphasis on SPBC's failure to establish that Top *718 Brass specifically engaged Main Hurdman to prepare the audit for SPBC, its repeated citations to European American Bank (majority opn, at 703, 704, 705, 707) and to the "unmistakable relationship" existing in that case (see, 65 NY2d, at 554), and its references to the exclusive "end and aim" language in Glanzer all send the same clear signal  i.e., that henceforth, the standard for liability will be a relationship or specific undertaking at least equal to that in European American Bank and sufficiently intimate to pass the privity test of Ultramares and Glanzer.
The majority holding sharply curtails the Credit Alliance holding. By imposing its "exclusive, end and aim" requirement (majority opn, at 704, 707), the Court reerects a barrier that has not appeared in our law since it was removed in 1977 in White v Guarente (supra). Prior to 1977, the law of negligent misrepresentation by accountants was guided by this Court's 1922 decision in Glanzer and its 1931 decision in Ultramares which required an exacting privity relationship between plaintiff and defendant. For all intents and purposes, plaintiff's relationship must have been that of a third-party beneficiary to the contract for the accountants' services. Indeed, under the Glanzer and Ultramares rationale, accountants' third-party liability was considered to be an extension of the rule of Lawrence v Fox (20 N.Y. 268) and Seaver v Ransom (224 N.Y. 233) for third-party beneficiary contractual responsibility (Glanzer v Shepard, 233 NY, at 241, supra; Ultramares Corp. v Touche, supra, at 182). The Ultramares Court noted that in Glanzer, the service provided "was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee" (Ultramares Corp. v Touche, supra, at 183).
In our 1977 White decision, we loosened the privity requirement of Ultramares without rejecting it outright (White v Guarente, 43 NY2d, at 362). In White, accountants hired by the general partners to audit a limited partnership were found liable to the limited partners even though there was no contract or contact with the limited partners or any specific undertaking of a duty to them. We stated in White:
"Here, accountant Andersen was retained to perform an audit and prepare the tax returns of Associates, known to be a limited partnership, and the accountant must have been aware that a *719 limited partner would necessarily rely on or make use of the audit and tax returns of the partnership, or at least constituents of them, in order to properly prepare his or her own tax returns. This was within the contemplation of the parties to the accounting retainer. In such circumstances, assumption of the task of auditing and preparing the returns was the assumption of a duty to audit and prepare carefully for the benefit of those in the fixed, definable and contemplated group whose conduct was to be governed, since, given the contract and the relation, the duty is imposed by law and it is not necessary to state the duty in terms of contract or privity" (White v Guarente, 43 NY2d, at 361-362 [emphasis added]).
Unlike the exaction of Ultramares and Glanzer that the relationship be so close that plaintiff is "in effect, if not in name" a party to the contract whose reliance is "the end and aim" of the transaction, the White requirement is that plaintiff's reliance need be only "one of the ends and aims of the transaction" (White v Guarente, 43 NY2d, at 362 [emphasis added]) and one which "was, or at least should have been, specifically foreseen" (id., at 362). Until today, Credit Alliance could be read as being consistent with White in not making accountants' liability contingent on their preparation of the audit for the specific benefit of the third party. No matter how it is viewed, today's decision effectively overrules White and significantly limits Credit Alliance.

III.
New York's existing privity rule under Credit Alliance is already the country's most exacting, followed by only a few jurisdictions (see, e.g., Colonial Bank v Ridley & Schweigert, 551 So 2d 390 [Ala]; Idaho Bank & Trust Co. v First Bancorp, 115 Idaho 1082, 772 P2d 720; Thayer v Hicks, 243 Mont 138, 793 P2d 784; Citizens Natl. Bank v Kennedy & Coe, 232 Neb 477, 441 NW2d 180). The Court's holding today requiring a heightened privity now makes New York the most restrictive of the jurisdictions purporting to apply Credit Alliance (see, e.g., Thayer v Hicks, supra; Duke v Touche Ross & Co., 765 F Supp 69, 77 [SD NY]; Guildhall Ins. Co. v Silberman, 688 F Supp 910, 914 [SD NY]; see also, Toro Co. v Krouse, Kern & Co., 827 F.2d 155 [7th Cir]; Equitable Life Assur. Socy. v Grant & Co., 627 F Supp 1023). *720 Most jurisdictions now adopt the more lenient Restatement approach allowing recovery whenever a particular party's reliance is foreseen (Restatement [Second] of Torts § 552) or some less restrictive variant (see, Thayer v Hicks, 793 P2d, at 788-789, supra; and First Natl. Bank of Commerce v Monco Agency, supra, at 1057-1060 [collecting cases]; see also, Credit Alliance Corp. v Andersen & Co., supra, at 553, n 11; Achampong, Common Law Liability of Accountants for Negligence to Non-Contractual Parties: Recent Developments, 91 Dick L Rev 677; Siliciano, Negligent Accounting and the Limits of Instrumental Tort Reform, 86 Mich L Rev 1929). Indeed, many maintain that New York should follow the national trend and relax its present privity requirement (see, e.g., Besser, Privity?  An Obsolete Approach to the Liability of Accountants to Third Parties, 7 Seton Hall L Rev 507; Note, Accountants' Liability for Negligence  A Contemporary Approach for a Modern Profession, 48 Fordham L Rev 401).
Finally, there must be no confusion about the posture of this dissent. The dissent does not urge that New York should abandon or in any respect "extend Credit Alliance" (majority opn, at 705). Nor does it suggest that New York should move closer to the national trend in making some adjustment of its present privity requirement. The dissent argues only this: that the factual questions in the record, applying the existing Credit Alliance rule, require an affirmance of the Appellate Division's denial of summary judgment. What the majority characterizes as merely a showing of SPBC's effort to turn a phone call into "deep pocket surety coverage" (majority opn, at 706) is a volume of evidence in which the critical elements pertaining to Main Hurdman's knowledge of SPBC's reliance on the audit  the first two Credit Alliance criteria  are concededly established. The single question is whether the record is sufficient to create a triable issue on the remaining element  i.e., some conduct linking Main Hurdman to SPBC and evincing Main Hurdman's conceded knowledge of SPBC's reliance. The majority's holding that the record is insufficient on this point results in a pronounced tightening of Credit Alliance, abandons White, and recreates the former privity barrier of Glanzer and Ultramares. I know of no policy or other reason supporting this significant change in our law and the majority gives none.
*721 I would affirm the order denying summary judgment.
Order reversed, etc.
NOTES
[*] Under SPBC's participation agreement with Bankers Trust, all of the loans to Top Brass are held in SPBC's name for the lenders' joint beneficial interest, and SPBC is authorized to sue in its own name to enforce the lenders' rights.
[1] In his deposition testimony concerning his conversation with one of the Main Hurdman auditors, whom he believed to be Richard Mirman, Seiden stated, in part: that he "spoke primarily in 1983 strictly about the receivables * * * and their effect on the P&L" and asked "if they thought you had adequate reserves" or "if they had any problems * * * that we as a lender should know about"; that he had told the auditor that he "was seeking their good auspices to help us out, and that we would be relying on them"; and that in response to his questions, the auditor stated that "they felt the reserves were adequate at this time" and that "there was nothing unusual that we should know about."
[2] SPBC's evidence supports the conclusion that this conversation took place prior to August 20, 1984 and that it was "highly unlikely" (see, record on appeal) that they would not have discussed SPBC's July 30, 1984 formal credit proposal. SPBC's submissions are sufficient, in any event, to raise questions of fact as to the contents of that conversation and the date when Main Hurdman was first aware of the SPBC credit negotiations which could be answered upon deposition of the auditors.
[3] Although the memorandum appears to be dated September 14, 1984, it also bears the date June 30, 1984. SPBC's submissions in opposition to summary judgment support the conclusion that Main Hurdman had received the minutes prior to the September date. In any event, the date of the receipt of the minutes by Main Hurdman is a factual question which could undoubtably be answered if the Main Hurdman auditors were deposed.
[4] There is evidence that Mirman changed the original typewritten wording of this notation by crossing out the words "up to" and writing in "at least", reflecting the $50 million proposal made by SPBC. Again, the significance of the revision presents a question of fact which could be answered if Mirman were deposed.
[5] Although the reference to the prior experiences in 1983 concerning receivables does not mention SPBC by name, it is inferable that it refers to SPBC's previous difficulties with the delinquent accounts reserve, the topic of Seiden's discussion with Main Hurdman in late 1983. The planning memo refers to accounts receivable based on the prior year's experience and review of the pencil draft, which refers to the then current negotiations for "at least $40 million * * * secured by accounts receivable". A question of fact, at least, is thus raised as to the significance of the reference to the prior experience in 1983.
[6] Although the subsequent events memo was dated September 14, 1984, there is evidence that it was completed before then.
[7] In his deposition testimony Seiden stated that Freeman told him that he knew that Top Brass was negotiating with SPBC "because the notes to the statement made some mention of the negotiation for a new line of credit" and that he "knew it was Security Pacific. He had been brought up to the fact by the company".

With specific reference to the receivables, Seiden pointed out to Freeman, "that the bad debt reserve as a percentage of the total receivables had  hadn't gone up much in year-ending `83" and he asked, "if there was anything that was underlying that would lead him to believe that the 8 percent was not an adequate number". According to Seiden, Freeman's reply "was one of those general kind of responses that they've done the job, and they've done their work, and they were comfortable with the fact that they were issuing an opinion, an unqualified opinion as far as the statement was concerned" (see, record on appeal).
[8] Although the majority suggests (majority opn, at 706, 708) that the New York case law sufficiently articulates the requirements of "linking conduct" under Credit Alliance, it cites no New York decisions enunciating a legal standard of linking conduct.