*17 OPINION OF THE COURT
Kaye, J.
In an action at common law by a lender against accountants for negligence in the preparation of a borrower’s financial statements, where a link between the accountants and the lender is not shown a complaint is properly dismissed (Credit Alliance Corp. v Andersen & Co., 65 NY2d 536), even though the Federal securities laws provide that the accountants may have statutory liability to the public.
This action arises out of the collapse in March 1983 of Turnkey Equipment Leasing, Inc. (TEL) and its wholly owned subsidiary Turnkey Information Processing, Inc. (TIP), companies in the business of selling and leasing data processing and computer software systems. The facts stated below summarize the allegations of the complaint.
From 1979 through December 1982 TIP, TEL and their affiliates (collectively Turnkey) and officers engaged in a fraudulent scheme involving the overstatement of accounts receivable through the issuance of false sales documents and leases. In May 1982, Westpac extended a $2 million line of credit to TEL, on which Turnkey could draw in consideration of granting Westpac security interests in leases, lease payments and leased equipment. Before its collapse, Turnkey drew down $961,000 of the line, virtually all of which turned out to be uncollectible. In 1981 Turnkey, desiring to make a public offering of securities, asked Drexel, Burnham, Lambert & Co. to make an underwriting commitment. Drexel would not make a commitment until Turnkey produced financial statements certified by independent public accountants as required by the Securities Act of 1933. Turnkey retained Seidman "to perform the audit examination to provide the necessary certification, and to provide interim financial statements * * * all for the purpose of raising capital in connection with the public offering.” Seidman performed the audit between June and September 1982 and in a report dated September 17, 1982 certified Turnkey’s financial statements dated March 31, 1981 and 1982.
Following negotiations with Turnkey in August 1982, in September Westpac reviewed the certified financial statements and in reliance thereon agreed to provide a $2 million bridge loan, to be repaid from the proceeds of the proposed public offering, provided that Drexel issued an underwriting commitment. Although Drexel declined to do so, in late October the underwriters Laid-law, Adams & Peck provided a commitment, and on December 1 *18 Westpac loaned Turnkey $2 million in consideration of Turnkey’s unsecured promissory note. When Turnkey’s fraud began to emerge, Seidman withdrew its certification in February 1983 and the proposed public offering was abandoned.
In its third cause of action, Westpac alleges that Seidman was grossly negligent or reckless in the conduct of its audit examination and its report, and in its fourth cause of action, Westpac alleges that Seidman was negligent in its audit examination and its report. Seidman’s duty to Westpac is premised upon the following:
"47. At the time it issued its report, Seidman & Seidman knew that Turnkey would seek a bridge loan from a bank to be repaid out of the public offering and it knew that the certified financial statements would be used by Turnkey in obtaining such a loan.
"48. As a result, Seidman & Seidman had a duty to potential bridge lenders, including Westpac, to use due professional care and skill in performing the audit and in issuing the report.”
Westpac claims that, both as to the third and fourth causes of action, Seidman is liable to it "in an amount exceeding $2,000,000” in compensatory damages and an equal amount in punitive damages.
Special Term denied Seidman’s motion to dismiss the third cause of action, finding sufficient specificity to state a cause of action for fraud. The court, however, granted Seidman’s motion with respect to the fourth cause of action, concluding that the allegations did not satisfy the test of Credit Alliance Corp. v Andersen & Co. (101 AD2d 231) that, in a negligence action against accountants, the class to whom a duty is owed must be limited. Special Term further struck the claim for punitive damages as to both causes of action. On an appeal taken only from that part of the order granting Seidman’s motion to dismiss the fourth cause of action, the Appellate Division reversed, reinstated the claim, and certified to us the question, "Was the order of this Court, which reversed the order of the Supreme Court, properly made?” Subsequently, we reversed the Appellate Division’s order in Credit Alliance Corp. v Andersen & Co. (65 NY2d 536, supra) and dismissed the negligence claim. Our decision in Credit Alliance compels a reversal here.
In Credit Alliance we concluded that certified public accountants may be held liable to noncontractual parties who rely on negligently prepared financial reports only where certain prerequisites are satisfied: (1) the accountants must have been aware *19 that the financial reports were to be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) there must be some conduct on the part of the accountants linking them to that party, which evinces the accountants’ understanding of that party’s reliance.
Here, the allegations of the complaint against Seidman fail to demonstrate a relationship between the parties sufficiently approaching privity. Although obtaining a bridge loan may be "a particular purpose” for which the financial statements were to be used by Turnkey — a purpose Seidman allegedly knew — the complaint does not allege that Seidman knew that Turnkey was showing the reports to Westpac. Rather, Westpac claims only that it was one of a class of "potential bridge lenders,” to which class as a whole Seidman owed a duty, and that it should be considered a "known party” because it was as of the date of the certification a substantial lender to Turnkey, and "thus a prime candidate for a bridge loan.” This is not, however, the equivalent of knowledge of "the identity of the specific nonprivy party who would be relying upon the audit reports” (Credit Alliance Corp. v Andersen & Co., 65 NY2d, at p 554, supra).
Moreover, there is no allegation that Seidman had any dealings with Westpac, had specifically agreed with Turnkey to prepare the report for Westpac’s use or according to Westpac’s requirement, had agreed with Turnkey to provide Westpac with a copy, or actually did so. Indeed, there is simply no allegation of any word or action on the part of Seidman directed to Westpac, or anything contained in Seidman’s retainer agreement with Turnkey which provided the necessary link between them (see, Credit Alliance Corp. v Andersen & Co., 65 NY2d, at pp 553-554, supra).
Westpac asserts that the purpose of the third requirement of Credit Alliance has been satisfied because, under the Federal securities laws, had a public offering been made Seidman would have been subject to liability to members of the public who purchased Turnkey stock for negligent misstatements or omissions in the certified statements (15 USC § 77k; Herman & MacLean v Huddleston, 459 US 375). Accordingly, Westpac argues, Seidman should be deemed to have accepted the risk that it could be sued by members of the public and, therefore, the risk that it could be sued by potential bridge lenders. In Credit Alliance, we concluded that the resolution of competing policy considerations embodied in Ultramares Corp. v Touche (255 NY 170) remained sound and that under the common law of this State accountants should not *20 have a duty to the public at large. Section 11 of the Securities Act of 1933 (15 USC § 77k), addressed to different policy concerns, was enacted as part " 'of the federal regulatory scheme governing transactions in securities’ ” (Herman & MacLean v Huddleston, 459 US 375, 380, supra, quoting Ernst & Ernst v Hochfelder, 425 US 185, 206) in order "to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering” (Herman & MacLean v Huddleston, 459 US 375, 381-382 [nn omitted], supra). Thus, the fact that Seidman might have been subject to actions under this Federal statute should not affect the scope of its duty at common law.
Accordingly, the order of the Appellate Division should be reversed, with costs, the order of Special Term dismissing the fourth cause of action reinstated, and the certified question answered in the negative.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons, Alexander and Titone concur.
On review of submissions pursuant to section 500.4 of the Rules of the Court of Appeals (22 NYCRR 500.4), order reversed, etc.