OPINION OF THE COURT
Bellacosa, J.
Plaintiff, an institutional lender lacking a contractual or other direct business relationship with defendant accounting firm, seeks to hold the defendant liable for alleged negligence committed by defendant’s predecessor in its 1984 audit of financial statements of its client, Top Brass Enterprises, Inc. (Top Brass). In October 1984, plaintiff, Security Pacific Business Credit, Inc. (SPEC), an asset based lender, and Bankers Trust Co.* loaned Top Brass approximately $40 million on a $50 million line of credit, secured by Top Brass’s accounts receivable and merchandise inventory. After Top Brass filed for bankruptcy in 1986, SPEC sued defendant Peat Marwick Main & Co., as successor to Main Hurdman. SPEC alleged that it had relied on Main Hurdman’s 1984 unqualified audit opinion and financial statements, which did not accurately present the financial position of Top Brass in that they negligently over-valued Top Brass’s accounts receivable and mer *699 chandise inventory. SPBC’s alleged reliance is premised essentially on a telephone call from its vice-president, Seiden, to Main Hurdman’s audit partner, Freeman, during and with respect only to the 1984 audit process and audit work papers supplied to SPEC by Top Brass. SPEC claimed losses on the loans of at least $8 million.
The issue presented is whether defendant accountants may be held liable in negligence by application of the principles of the Credit Alliance Corp. v Andersen & Co. (65 NY2d 536) line of precedents. We conclude that SPEC failed to demonstrate the existence of a relationship between itself and defendant’s predecessor accounting firm "sufficiently approaching privity” (id., at 553; see also, id., at 546, 550, 554) and, therefore, we reverse the order of the Appellate Division and grant defendant summary judgment dismissing the complaint.
L
Top Brass, a publicly owned retailing chain, retained Main Hurdman, a national accounting firm, to audit its financial statements and issue an independent audit opinion for fiscal years 1983, 1984 and 1985. In 1983, when Top Brass was seeking an increased $20 million line of credit, Main Hurdman assisted it in negotiating with several lenders, including SPEC. SPEC alleges that its vice-president, Seiden, informed Main Hurdman that it would be relying on Main Hurdman’s first quarter 1984 audit opinion in considering Top Brass’s 1983 line of credit application, and that an unnamed Main Hurdman employee made assurances to Seiden about its 1983 audit findings. SPBC’s proposal for such a loan was ultimately not accepted when Top Brass’s lender at that time was able to meet Top Brass’s lending needs. Those independent dealings are irrelevant to the matter before us because the heart of this lawsuit between SPEC and Peat Marwick relates solely to Main Hurdman’s 1984 audit opinion prepared for Top Brass.
In 1984, Top Brass sought a new $50 million line of credit and on July 30, 1984, SPEC issued a preliminary proposal letter to Top Brass in response to the request, subject to SPBC’s confirmation of Top Brass’s financial condition. SPEC conducted its own independent examination of Top Brass’s books to assess its accounts receivable; however, SPBC’s credit review staff did not contact Main Hurdman’s personnel during the review and were not directed to do so. According to Seiden, SPEC thereafter advised Top Brass that final approval *700 of the line of credit was conditioned on Main Hurdman’s 1984 audit opinion. There is no evidence in the record that SPEC or Top Brass also notified Main Hurdman of this, or of any direct contact between the parties during that preaudit period.
Main Hurdman’s audit team, headed by audit partner Douglas Freeman, conducted its audit field work from August 20 to September 12-13, 1984. Main Hurdman’s "Engagement Letter” to Top Brass dated August 20, 1984 indicated that the "purpose and scope” of the audit of Top Brass’s 1984 financial statements were "to express an opinion on [its] consolidated financial statements”. It made no mention of SPEC, loan negotiations, or of any other uses or potential uses of the audit opinion. The proof in the record that Main Hurdman was aware during the audit that Top Brass was negotiating for a loan is limited to (1) a reference in a preliminary balance sheet ("Pencil Draft”); (2) Main Hurdman’s September 14, 1984 "Subsequent Events Memo”, prepared by its auditors after the field work was complete, indicating that Top Brass was then "currently negotiating for a revolving line of credit of at least $40 million * * * with [United Mizrachi Bank] and/or Security Pacific * * * to be secured by accounts receivable” (emphasis added); and (3) the minutes of Top Brass’s Board of Directors meeting of June 30, 1984.
According to Seiden, upon his receipt on September 13 from Top Brass of the 1984 draft financial statements and audit opinion, he made a telephone call to Main Hurdman’s audit partner, Freeman, to discuss the audit report, at the suggestion of Top Brass officers. The date and substance of that phone call are uncertain. SPEC contends in its complaint that the call was made prior to September 12, 1984, the date of defendant’s 1984 audit opinion. SPBC’s Seiden contends the call was made after September 13 but before September 17, during the period he was drafting a "Credit Committee Recommendation” (CCR) to SPBC’s Credit Committee, recommending approval of Top Brass’s loan request. Freeman did not have any recollection of that phone cedi or any call from Seiden, but defendant conceded for purposes of summary judgment that a telephone call had occurred. That call constitutes the linchpin of plaintiff’s claim.
According to Seiden’s recollection of that phone conversation, Freeman indicated in response to Seiden’s questions that he was aware of the ongoing negotiations between Top Brass and SPEC for a line of credit; that the income figure in the *701 1984 audit report would be the same as that in the draft audit report; that there would be no qualifications in the audit opinion; that Top Brass’s system for retaining adequate reserves was "under control”; and that the firm had not uncovered anything that a lender should know that was not reflected in the draft audit report. Seiden informed Freeman that SPEC would be relying on the audit report, and would be approving the loan based on the collectability of accounts receivable and over-all profitability. By Seiden’s own account, Freeman responded to his inquiries with "those general kind of responses that they’ve done the job, and they’ve done their work, and they were comfortable with the fact that they were issuing an * * * unqualified opinion”. Seiden did not ask Freeman to do anything specific for SPEC and did not make any notes of that phone call. The record does not indicate any other or further contacts between SPEC and Main Hurdman before SPEC approved the loan to Top Brass on October 8, 1984.
Seiden testified that in making the approval recommendation in the OCR, he relied on the tentative draft sent by Top Brass and on the general assurances he claimed Freeman had given him during that phone call. However, the loan recommendation made no reference to the 1984 audit, to Main Hurdman, or to the telephone call. Also, Seiden’s deposition testimony demonstrates that the OCR loan approval recommendation was already "in its circulation stage” when he telephoned Freeman. This summary constitutes the controlling record and facts in the analysis resolving this litigation, notwithstanding the expansive inferences employed in the dissenting opinion.
Main Hurdman’s unqualified 1984 audit opinion of September 12, 1984, the date the field work was completed, was issued to Top Brass on September 26, 1984 and was filed with the Securities Exchange Commission pursuant to the annual filing requirements for publicly held corporations. Top Brass thereafter sent SPEC a copy of the publicly filed report. SPEC and Bankers Trust subsequently granted Top Brass the $50 million line of credit it had sought.
In its 1985 audit report, defendant indicated for the first time that 30% of Top Brass’s accounts receivable were uncollectible. As SPBC’s expert reported, had this been discovered for the prior year’s report, it would have nullified Top Brass’s profit and the report would instead have reflected a substantial loss. In August of 1986, Top Brass filed for bankruptcy.
*702 SPEC sued Peat Marwick, alleging that it relied on Main Hurdman’s 1984 unqualified audit opinion which negligently indicated that Top Brass’s financial statements accurately reflected its financial condition, and that Main Hurdman was aware of SPEC’s intended reliance before it completed its 1984 audit. Defendant Peat Marwick denied these allegations in its answer, asserted several affirmative defenses, and thereafter moved for summary judgment. Supreme Court granted the motion dismissing the complaint, holding that insufficient evidence existed "to create a triable issue of fact as to Main Hurdman’s awareness of SPEC’s reliance on its audit report and as to linking conduct on the part of Main Hurdman.” A divided Appellate Division reversed, denying summary judgment to defendant with leave to renew upon conclusion of all pretrial discovery (165 AD2d 622). The Appellate Division granted leave to appeal on a certified question. We now reverse and reinstate Supreme Court’s grant of summary judgment to defendant dismissing the complaint. Plaintiff having failed to satisfy CPLR 3212 (f) and there being no triable issues of material fact, defendant was properly awarded summary judgment by the trial court.
IL
When accountants conduct a traditional financial audit, they undertake a duty of due care in the performance of their engagement to the party which has contracted for their services (Iselin & Co. v Mann Judd Landau, 71 NY2d 420). In "carefully circumscribed” instances (id., at 425), accountants may also incur liability to injured third parties who rely on their work, even in the absence of a direct contractual relationship between the accountants and the third party. This Court established an analytical framework for determining the applicability of this policy-based extension of common-law liability in Credit Alliance Corp. v Andersen & Co. (65 NY2d 536, supra): "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants’ understanding of that party or parties’ reliance” (id., at 551). The indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or *703 bond with the once-removed accountants "sufficiently approaching privity” based on "some conduct on the part of the accountants” (Westpac Banking Corp. v Deschamps, 66 NY2d 16, 19; see, Credit Alliance Corp. v Andersen & Co., supra, at 550-553; Iselin & Co. v Mann Judd Landau, 71 NY2d 420, 425, supra; Ultramares Corp. v Touche, 255 NY 170, 182-183).
Significantly, the Court in Credit Alliance also expressly emphasized that while the newly articulated criteria "permit some flexibility in the application of the doctrine of privity to accountants’ liability, they do not represent a departure from the principles articulated in Ultramares [supra], Glanzer [v Shepard (233 NY 236)] and White [v Guarente (43 NY2d 356)], but, rather, they are intended to preserve the wisdom and policy set forth therein.” (Credit Alliance Corp. v Andersen & Co., supra, at 551 [emphasis added].)
In Credit Alliance Corp. v Andersen & Co. (65 NY2d 536, supra), we declared that a defendant accounting firm, Andersen & Co., was not liable to a noncontracting party-plaintiff, Credit Alliance Corp., which had loaned money to Andersen’s client in reliance on Andersen’s erroneous audit report of the client’s financial statements, which the client had supplied to Credit Alliance. While Credit Alliance alleged that Andersen knew or should have known that its client was showing the audit reports to Credit Alliance to induce reliance, the Court determined that Credit Alliance failed to demonstrate the existence of a relationship between Andersen and Credit Alliance "sufficiently approaching privity”. The Court emphasized that Andersen had not been retained by its client for the particular purpose of inducing Credit Alliance to extend the client credit; had not had any direct dealings with Credit Alliance; had not specifically agreed with its client to prepare the audit report for Credit Alliance’s use or according to its requirements; had not specifically agreed with its client to provide Credit Alliance with a copy of its audit report or actually did so; and had not directed any words or action toward Credit Alliance to establish the necessary link with it (Credit Alliance Corp. v Andersen & Co., id., at 553-554; see also, Westpac Banking Corp. v Deschamps, 66 NY2d 16, 19, supra).
European Am. Bank & Trust Co. v Strauhs & Kaye (65 NY2d 536), decided as a companion, complementary case to Credit Alliance, resulted in a ruling not to dismiss the noncontracting plaintiff lender European American Bank’s complaint *704 against the defendant accounting firm Strauhs & Kaye. The Court held that the allegations in the complaint and affidavit "posit a direct nexus between the parties” (id., at 545 [emphasis added]). That "direct nexus” consisted of the "parties’ direct communications and personal meetings” (id., at 554; see, Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 425-426). The facts, as alleged by European American Bank, "clearly showfed] that [Strauhs & Kaye] was well aware that a primary, if not the exclusive, end and aim of auditing its client * * * was to provide [European American Bank] with the financial information it required” (European Am. Bank & Trust Co. v Strauhs & Kaye, supra, at 554 [emphasis in original]). European American Bank had alleged that Strauhs & Kaye was aware of the "particular purpose for their services and certain conduct on their part creating an unmistakable relationship with the reliant plaintiff. It [was] unambiguously claimed that the parties remained in direct communication, both orally and in writing, and, indeed, met together throughout the course of [European American Bank’s] lending relationship with Majestic Electro, for the very purpose of discussing [Majestic’s] financial condition and [European American Bank’s] need for [Strauhs & Kaye’s] evaluation” (id., at 554 [emphasis added]). Further, Strauhs & Kaye’s representatives made repeated personal representations to European American Bank concerning Majestic’s assets. The dissenting opinion studiously avoids the language and impact of European American and its important place in the chronological sequence of precedents governing this field of law.
IIL
Applying the precedents and principles to this case, we conclude that on this record plaintiff has failed to make the necessary demonstration of the existence of a relationship between the parties to this litigation "sufficiently approaching privity”. In opposing Peat Marwick’s motion for summary judgment, SPEC was required to produce evidentiary proof, in admissible form, of all three elements of the Credit Alliance analysis, warranting a trial on material questions of fact (see, Iselin & Co. v Mann Judd Landau, 71 NY2d 420, 425, supra; Zuckerman v City of New York, 49 NY2d 557). It has failed to meet its burden.
In opposing summary judgment, SPEC relies on evidence *705 indicating that Main Hurdman was aware, before it issued its 1984 unqualified audit report, that SPEC and Top Brass were involved in negotiations for a line of credit to be secured by accounts receivable. To establish a relationship sufficiently approaching privity, particularly the indispensable linking conduct on which the parties heavily focus, SPEC primarily relies on the single phone call. It was allegedly placed by SPEC’s vice-president, Seiden, to Main Hurdman’s audit partner, Freeman, at Top Brass’s suggestion, with respect only to the 1984 audit. SPEC also relies on Main Hurdman’s knowledge acquired from its own 1984 audit work papers. Notwithstanding the dissenting opinion’s halving of the analysis by concentrating only on aspects of Main Hurdman’s knowledge, and its dispensing with the concomitant conduct ingredient that must also be attributable to Main Hurdman in order to hold it liable, SPEC’s evidence, for summary judgment purposes, falls short of the Credit Alliance criteria.
The fact pattern of European American offers a cogent contrasting illustration. There, the accountants had multiple, direct and substantive communications and personal meetings with the relying lender during the entire course of the lending relationship. Here, SPEC’s claimed relationship to Main Hurdman, "sufficiently approaching privity”, rises or falls essentially on the single unsolicited phone Call. We conclude that the relationship fails to connect because Main Hurdman’s partner’s responses to SPEC’s inquiries in that single call placed after the audit field work was completed were, viewed even in the most favorable light plaintiff places on them, "limited to generalities that nothing untoward had been uncovered in the course of the audit and that an unqualified opinion would issue, certifying the tentative draft which plaintiff had received from Top Brass itself” (Security Pac. Business Credit v Peat Marwick Main & Co., 165 AD2d 622, 626). SPEC’s efforts to elevate these facts to the critical rank and linking relationship akin to privity, as our precedents require, are unavailing. SPEC cannot unilaterally create such an extraordinary obligation, imposing negligence liability of significant commercial dimension and consequences by merely interposing and announcing its reliance in this fashion.
Moreover, no sufficient conduct appears in this record evidencing a relationship between SPEC and the accountants, which Credit Alliance contemplates. In this respect, the dissent would substantially extend Credit Alliance by allowing any conduct by the accountants to result in a potential for *706 liability. This plainly is not what Credit Alliance and its related precedents effected. As the Supreme Court observed in granting defendant’s motion for summary judgment in this case, "if a lender can secure possible loan recourse against a borrower’s auditor by the simple act of calling the auditor before advancing a loan and announcing reliance on the auditor’s opinion, then every lender’s due diligence list will in the future mandate such a telephone call. For the small price of a phone call, the bank would in effect acquire additional loan protection [by] placing the auditor in the role of an insurer or guarantor of loans extended to [its] clients.” The facile acquisition of deep pocket surety coverage, with no opportunity for actuarial assessment and self-protection, by the party sought to be charged, at the mere cost of a telephone call by the lender, is a bargain premium rate indeed. This, too, was surely not within the ambit of liability promulgated and recognized in Credit Alliance.
As exemplified in many of this Court’s precedents, in contradistinction to plaintiff’s allegations here, no claim is made and no evidence is tendered that Main Hurdman was retained to prepare the audit report for the purpose of inducing SPEC to extend credit to Top Brass, or that Main Hurdman ever specifically agreed with Top Brass to prepare the report for SPBC’s use or according to SPBC’s requirements (Credit Alliance Corp. v Andersen & Co., 65 NY2d 536, 553-554, supra; see, Iselin & Co. v Mann Judd Landau, 71 NY2d 420, 426-427, supra; and Westpac Banking Corp. v Deschamps, 66 NY2d 16, 19, supra). While those features are not exclusive prerequisites to satisfy the Credit Alliance analysis, they provide confident and significant foundational support, which this Court has previously recognized and, therefore, appropriately now considers in deciding this case.
Also, there is no evidence that Main Hurdman shaped its 1984 audit opinion to meet any needs of SPEC. Neither is there any claim or proof that Main Hurdman directly supplied SPEC with a copy of the audit report or opinion or ever agreed to do so (compare, Credit Alliance Corp. v Andersen & Co., supra, at 553; and Westpac Banking Corp. v Deschamps, supra, at 19, with Glanzer v Shepard, 233 NY 236, 239). Indeed, the record shows that Main Hurdman’s client, Top Brass, sent SPEC the report only after it was publicly filed with the SEC. Similarly, the audit engagement letter between Top Brass and Main Hurdman does not mention SPEC or provide or suggest the necessary link to SPEC (see, Credit *707 Alliance Corp. v Andersen & Co., supra, at 554). To be sure also, there is no claim that Main Hurdman was aware that "a [emphasis added] primary, if not the exclusive, end and aim [emphasis in original] of auditing its client [Top Brass] was to provide [SPEC] with the financial information it required” (European Am. Bank & Trust Co. v Strauhs & Kaye, 65 NY2d 536, 554, supra). These observations are also not new and do not carry the definite article that the dissenting opinion emphasizes in order to knock down its strawperson argument (dissenting opn, at 717-719). In fact, the record indicates that the primary, if not exclusive, end and aim of the Main Hurdman audit was for use in Top Brass’s audit report as required by Federal law for a publicly held company. While Main Hurdman knew the identity of the specific party, SPEC, the complaint and supporting documents fail to allege or demonstrate Main Hurdman’s awareness of any other "particular purpose” for their services, or conduct on the part of Main Hurdman creating an "unmistakable relationship” with SPEC (cf., European Am. Bank & Trust Co. v Strauhs & Kaye, supra, at 554). Finally, the evidence of the contacts and discussions between Main Hurdman and SPEC with regard to the 1983 proposed $20 million line of credit cannot bridge the chasm between SPEC and Main Hurdman with respect to the 1984 audit report (see, Credit Alliance Corp. v Andersen & Co., supra; Westpac Banking Corp. v Deschamps, 66 NY2d 16, 19, supra). These illustrations have been presented for what they are— nonexclusive types of activity recognized and considered in this Court’s prior cases to evaluate whether a relationship "sufficiently approaches privity”. They are self-evidently not newly minted curtailments of the type of conduct that demonstrates third-party assumption of responsibility under the Credit Alliance analysis.
The dissenting opinion has also made other assertions which require a brief additional response lest there be misunderstanding of the Court’s analysis, meaning and holding in this case. First, we do not accept the mischaracterization of our application of the Credit Alliance test and related precedents (dissenting opn, at 708-709,717-719). These precedents specifically retain a key requirement of linkage "sufficiently approaching privity”. Moreover, the authoritative sources from which the Court derives the meaning and application of that phrase in this case are its own recent controlling precedents, which "do not represent a departure from the principles articulated in Ultramares, Glanzer, and White but, rather * * * are intended *708 to preserve the wisdom and policy set forth therein.” (Credit Alliance Corp. v Andersen & Co., 65 NY2d, at 551, supra.) It is particularly unnecessary to engage the dissenting opinion on its use of Federal lower court interpretations of New York substantive common law in this area (dissenting opn, at 715, 719-720), because this Court’s precedents are the best evidence of this State’s common law and serve as the sole guiding and controlling basis for the Court’s decision today.
In sum, Main Hurdman’s audit work was clearly for the benefit of its client, Top Brass, as a "convenient instrumentality for use in the development of [its] business, and only incidentally or collaterally for the use of those to whom [Top Brass] might exhibit it thereafter” (Ultramares Corp. v Touche, 255 NY, at 183, supra; cf., Glanzer v Shepard, 233 NY 236, supra). Only recently this Court reaffirmed the principle that the duty to noncontractual third parties is defined "narrowly” (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 424-425, supra). We have declined to adopt the broad-brush transformation of the liability formula espoused by the dissenting opinion, because such an extension of liability to noncontracting parties is "unwise as a matter of policy * * * or, at the least, a matter for legislative rather than judicial reform” (id., at 425; see, Credit Alliance Corp. v Andersen & Co., 65 NY2d 536, 553, n 11, supra). The Court thus appropriately adheres to its settled rejection of the dissenting opinion’s interwoven implication that sweeping liability should be newly and involuntarily imposed on the entire accounting industry by the simple act of lenders communicating their reliance in the manner promoted in this case.
Accordingly, the order of the Appellate Division should be reversed, with costs, defendant’s motion for summary judgment dismissing the complaint granted, and the certified question answered in the negative.

 Under SPBC’s participation agreement with Bankers Trust, all of the loans to Top Brass are held in SPBC’s name for the lenders’ joint beneficial interest, and SPBC is authorized to sue in its own name to enforce the lenders’ rights.