[702 NYS2d 40]

Harold T. Parrott, Respondent, v Coopers & Lybrand, L. L. P., Appellant.

Harold T. Parrott, Appellant, v Coopers & Lybrand, L. L. P., Respondent.

First Department, January 20, 2000

### APPEARANCES OF COUNSEL

*Maryann Peronti* of counsel (*John F. Storz* on the brief; *Koerner, Silberberg & Weiner, L. L. P.,* attorneys), for respondent-appellant.

*Alan M. Gelb* of counsel (*Theodore Snyder, Richard Keenan* and *Joseph A. Clark, III* on the brief; *Jones Hirsch Connors & Bull, P. C.,* and *Coopers & Lybrand, L. L. P.,* attorneys), for appellant-respondent.

### OPINION OF THE COURT

Tom, J.

Plaintiff Harold Tod Parrott was employed as Vice-President of Sales by nonparty Pasadena Capital Corporation, a privately held investment advisor firm located in California. A majority of the company's shares were held by its CEO, with employees, including plaintiff, holding various minority interests. Under a January 1, 1992 stock purchase agreement, plaintiff purchased 40,500 shares at $28.22 per share. The purchase agreement provided that, upon termination of plaintiff's employment, the company would purchase back these shares at fair market value to be determined on a minority basis by an independent third-party analysis conducted in accordance with the company's employee stock ownership plan.

Defendant accounting firm had provided accounting reports to the company twice annually, on December 31 and June 30, for several years. The accountants were retained by the company and reported only to the company. As per the

December 20, 1993 letter of continuing engagement, the accountants valued the company on a minority interest basis, exclusive of added value or premiums in connection with the sale or proposed sale of the company. Each biannual report was based on two methodologies: a discounted cash flow method, and a market comparable method relying on the stock values of similar companies publicly traded. Under the terms of engagement, the company's management was required to keep the accountants informed of any material changes in operation, management or financing, and the company was required to review draft reports prior to issuance to verify accuracy of the analysis and conclusions.

Plaintiff was terminated on May 31, 1996. When it appeared that the repurchase provision of the stock purchase agreement would be invoked after his termination, plaintiff initially resisted the repurchase. His initial recourse, understandably, was against his former employer. Plaintiff commenced a Federal action in the Southern District of New York in August 1996 to enjoin Pasadena from exercising its right to buy back plaintiff's stock under the stock purchase agreement. He challenged the legality of his termination as well as what he expected to be defendant's valuation, and contended that the repurchase could not be triggered by a wrongful termination. In that action, in which he also sought an independent valuation, he estimated the value at $120 per share, arising in part from an anticipated sale of the company. However, plaintiff did not allege that an identified purchaser or a pending offer for the company existed.

By letter dated September 26, 1996, the company gave notice that it was exercising its right to repurchase the stock, and explained that the value it relied on was established by defendant accounting firm in the most recent biannual report. The accountants set a value of $78.21 per share as of June 30, 1996. This represented a total company value of $117,000,000, divided by the number of shares. The result was that plaintiff was offered $3,069,208.50 payable over five years, plus interest, for stock that he had purchased for $1,143,035 in 1992.

On or about January 14, 1997, the Federal court denied plaintiff's motion for a preliminary injunction on the basis that recovery of a monetary award provided an adequate remedy at law and that he had failed to demonstrate irreparable injury. In March 1997, plaintiff entered a so-ordered stipulation with his employer providing for a repurchase price of $3.9 million without prejudice to plaintiff seeking a higher price in litiga-

tion against the employer. Subsequently, the Federal District Court directed that the dispute was to be arbitrated pursuant to the arbitration provisions of the stock purchase agreement and an arbitration proceeding was commenced in California against the company.

Plaintiff next sought recourse against the accountants, and commenced the present action in 1997. The complaint sounded in professional negligence, negligent misrepresentation and aiding and abetting the employer's breach of fiduciary duty. Under the negligence and misrepresentation claims, plaintiff argued that he had reasonably relied on the accountants' misrepresentations and omissions when he stipulated to the sale of the shares. Under the breach of fiduciary duty claim, he argued that the accountants had changed the valuation methodology, at the employer's insistence, in order to reduce the price of plaintiff's shares, and that plaintiff was thereby induced to accept a lesser value for his stock. We, as well as the dissent, agree that this latter claim, which rests solely on conclusory allegations, cannot be sustained.

Defendant then moved for summary judgment. The motion court, finding that there were factual issues regarding, *inter alia*, whether defendant negligently prepared the valuation in failing to account for the company's marketability, the extent to which defendant knew plaintiff was bound by the results of its valuation, and whether defendant knew of the company's alleged breach of fiduciary duty, denied summary judgment as to all claims.

■ Initially, we find that New York law, rather than California law, applies. Although the claim arose from conduct occurring in California, New York is the common domicile of plaintiff and defendant, which maintains its principal place of business here. New York has the greater interest in extending the protection of its own laws to its own domiciliaries (*First Interstate Credit Alliance v Arthur Andersen & Co.*, 150 AD2d 291, 293-294). However, even under New York law, plaintiff cannot prevail.

■ The analysis of the malpractice claim starts from the general proposition that under New York common law, accountants do not have a duty to the public at large (*Westpac Banking Corp. v Deschamps*, 66 NY2d 16). Rather, traditionally, as noted by Chief Judge Cardozo in *Ultramares Corp. v Touche* (255 NY 170) in dismissing a cause of action against an accounting firm for inaccurately prepared financial statements relied on by a plaintiff having no contractual privity with the

accountants, privity was the necessary predicate for accounting liability. The duty of care arose from the relationship. Among Cardozo's concerns, still applicable decades later, was that any mistake by an accountant otherwise might expose that accountant, or any accountant, to liability by a limitless class of aggrieved parties. In *Ultramares*, Chief Judge Cardozo addressed and distinguished his prior ruling in *Glanzer v Shepard* (233 NY 236), upon which the dissent presently relies for the proposition that liability may arise when the third party must rely on a bean counter's report. The distinction was that in *Glanzer*, a bean counter had affirmatively assumed a duty of care to the specified third party for a specific purpose, to wit, give accurate weight of a quantity of beans, which was not specifically a contractual obligation, and, hence, privity did not strictly apply. Those factors are not present in the case before us. These different traditional approaches to third-party liability were joined and analyzed in the Court of Appeals landmark *Credit Alliance* ruling. *Credit Alliance Corp. v Arthur Andersen & Co.* (65 NY2d 536) did not overturn the common-law rule, but only expanded it modestly, reflecting the modern ubiquity of financial statements, to allow for the liability of an accountant who provides advice to a third party with whom the accountant is not in privity, but with whom a close relationship nevertheless exists. At most, *Credit Alliance* resolved the tension, if any, between these two lines of Cardozo jurisprudence.

*Credit Alliance* sets forth three criteria for establishing the liability of accountants on the basis of advice or services to clients when noncontracting third parties claim injury as a consequence of that advice: the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes, upon which a known party or parties were intended to rely, and there must have been some conduct on the part of the accountants linking them to that party or parties' reliance (*supra,* at 551). These "indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed accountants" (*Security Pac. Bus. Credit v Peat Marwick Main & Co.*, 79 NY2d 695, 702-703). Hence, although there is some conceptual overlap among the showings necessary to establish these requirements, the Court of Appeals has nevertheless set forth three discrete criteria. Evidentiary proof, in admissible form, must be offered in support of all three criteria in order to warrant trial (*Security Pac. Bus. Credit v*

*Peat Marwick Main & Co.*, at 704). As with a three-legged table, remove one prop, and the entire structure must fall. So, too, here, where I conclude that the inadequacy of the linkage between the accountants and plaintiff is fatal to plaintiff's theory of liability.

The Court of Appeals policy-based expansion of an accountant's common-law liability to a third party, with whom the accountant has no contractual or direct relationship, turns in part on whether that plaintiff can establish the correlates of a contractual or direct relationship. This expansion, though it "permit[s] some flexibility in the application of the doctrine of privity to accountants' liability," as noted above, does not represent a departure from traditional modes of analyzing such privity-based liability (*Credit Alliance Corp. v Arthur Andersen & Co.*, at 551). Rather, the analytical model is whether there is a "relationship sufficiently approaching privity" between plaintiff and the accountants (*William Iselin & Co. v Mann Judd Landau*, 71 NY2d 420, 423) or a direct "nexus" (*European Am. Bank & Trust Co. v Strauhs & Kaye*, 65 NY2d 536, 554 [decided with *Credit Alliance*]) or, as we have characterized it, "the functional equivalent of privity" (*John Blair Communications v Reliance Capital Group,* 157 AD2d 490, 491). The factors utilized in demonstrating the requisite relationship depend not only on the number of contacts but also on the substantive nature of the contacts. While the dissent characterizes nexus as being multifactored, there still must be a demonstrably direct relationship, which is absent in this case.

For instance, in *European American Bank (supra)*, the Court found a direct nexus between the parties based on the fact that the accountants had multiple, direct and substantive meetings with the third parties. The *Security Pacific* Court found the facts of *European American Bank* to be a "cogent contrasting illustration" since the plaintiff's claimed relationship to the accounting firm in *Security Pacific*, "rises or falls essentially on the single unsolicited phone call * * * 'limited to generalities' " coupled with an assurance by the accountant to the third party that an audit of the client had uncovered nothing wrong (*supra,* at 705). The limited nexus in *Security Pacific* did not " 'sufficiently approach[ ] privity' " (*Security Pac. Bus. Credit v Peat Marwick Main & Co., supra,* at 705). The Court of Appeals in *Westpac Banking Corp. v Deschamps* (66 NY2d 16, *supra*), analyzing the "relationship" criterion, found no direct nexus under the facts of that case in the absence of any allegation that the accountants had any dealings with the plaintiff, or

had agreed with the client to prepare the report for plaintiff's use or according to plaintiff's requirement, or had agreed with the client to provide that plaintiff with a copy and had actually done so. "Indeed, there is simply no allegation of any word or action on the part of [the accountants] directed to [plaintiff] or anything contained in [the accountants'] retainer agreement with [the client] which provided the necessary link between them" (*supra,* at 19). The record before us indicates there was never any similar contact between plaintiff and the accountants.

By contrast, in *John Blair Communications (supra)*, we found the requirement satisfied by the numerous meetings between the parties, and in excess of 20 specific allegations in the complaint establishing the relationship. Similarly, we found "the requisite nexus" present in *Cherry v Herbert & Co.* (212 AD2d 203) where there were personal meetings between the parties, the accountants' personnel were aware of the purposes of their actions vis-à-vis the nonclient plaintiffs, and assurances were personally communicated to the plaintiffs by the accountants. Although those facts are not a necessary baseline for evaluating whether a relationship exists, they are certainly illustrative, and the omission of any relevant substantive allegations in the present case is a telling defect. In *Security Pacific*, at least there was an alleged telephone communication between plaintiff's vice-president and an audit partner at the accounting firm, who provided verbal assurances. But that plaintiff's "efforts to elevate these facts to the critical rank and linking relationship akin to privity * * * [were] unavailing" (*Security Pac. Bus. Credit v Peat Marwick Main & Co., supra,* at 705), requiring rejection of liability under the *Credit Alliance* criteria.

In some respects, the dissent conflates these separate requirements, in support of which it cites cases for general propositions that are not on point with the specific accounting liability issue before us. However, even broadly speaking, the overlap of these requirements does not create a privity-like context where none is to be found in the unadorned facts. The dissent contends that plaintiff might have been "known" in the sense that he fit within a class of persons—employees—that was "known" to the accountants (*but see, Westpac Banking Corp. v Deschamps, supra*) and for whose benefit the report establishing annual value was issued. Since there is no such evidence of the accountants' knowledge of the particular use to which the report would be put vis-à-vis plaintiff's particular

situation, I also respectfully question the dissent's conclusion that plaintiff passes muster under *Credit Alliance* as to this criterion. The dissent also suggests that the requisite "knowledge" may be imputed to defendant accountants insofar as this was purportedly a "small" company—although that characterization is not clear—in which plaintiff held a high position. This remains sheer surmise. However, if the basic requirement of a relationship approaching privity cannot be established, the point remains academic. Even if we stretch the "specific purposes" requirement to accommodate an employer's buyback of stock from an employee, and even if we deem plaintiff's reliance as arising under the coercive circumstances of the buyback, as the dissent would do, there still must have been conduct by the accountants linking them to plaintiff "approaching privity." That is simply absent in this case. As the Court of Appeals has noted, whether or not the plaintiff may be deemed to have "relied" on the "advice" is not dispositive: a third-party plaintiff "cannot unilaterally create such an extraordinary obligation, imposing negligence liability of significant commercial dimension and consequences by merely interposing and announcing its reliance in this fashion" (*Security Pac. Bus. Credit v Peat Marwick Main & Co., supra,* at 705). Absent "sufficient conduct * * * evidencing a relationship between [plaintiff] and the accountants * * * [t]his plainly is not what *Credit Alliance* and its related precedents effected" (*supra,,* at 705-706).

The dissent also cites to *White v Guarente* (43 NY2d 356), decided the decade preceding *Credit Alliance*, for the proposition that the requisite relationship may be found between the accountants and the class of persons in which a plaintiff has membership. However, that general proposition, accurate under the facts of that case, has no application here. The accounting firm in *White* prepared tax returns for the partnership, including the 40 limited partners, who, naturally, relied on the partnership tax returns in preparing their own annual tax returns. As noted in Judge Cooke's opinion (*White v Guarente, supra,* at 362), "[t]his was within the contemplation of the parties to the accounting retainer." The retainer contract imposed the specific duty on the accountants and created the limited partners' rights to an accurate accounting. That particular service was one of the "ends and aims of the transaction," rather than being " 'merely one possibility among many' " (*supra,* at 362). Hence, the question of privity was beside the point. In the present case, the "end and aim" of the service was

to provide an annual accounting for employee pension plan purposes. A potentially different use, such as that herein, was too remote to be foreseeable. In any event, with the subsequent *Credit Alliance* ruling, the Court of Appeals refined the analysis, superseding *White*.

In the case before us, there is no indication that plaintiff ever met or even communicated with the accountants, or that the accountants were even aware that plaintiff owned company stock, or that the stock would be repurchased by the employer-client at a value fixed by the accountants. There were no written or verbal communications between plaintiff and the accountants on the subject matter of the stock values prior to the report being issued. At best, the accountants acted pursuant to an ongoing engagement with their client—the employer—to simply appraise the stock twice yearly for employee stock ownership plan purposes generally, and this is an insufficient basis upon which to ground a relationship approaching privity with this plaintiff.

Plaintiff concededly never read nor even received the accountants' report, and none had been provided to him. The accountants did not prepare the June 1996 report with any regard to plaintiff's termination. Nor did the accountants have a copy, or even knowledge of, any stock purchase agreement between plaintiff and the company. In sum, the accountants' discharge of their routine responsibilities was completely unrelated to Pasadena's purchase of plaintiff's stock under the stock purchase agreement.

*Credit Alliance*'s expansion of the common-law doctrine that relied on privity was never intended to create the expedient of new liability grounded merely on the fact that a third party utilizes an accountant's report. Returning to the point first illustrated in *Ultramares (supra)*, such open-ended liability would have unintended and far-reaching consequences, effectively creating remedies that were never necessary to address the tort in question. The dissent notes the arguably small size of this company of less than 100 employees to conclude that widening the scope of accountant liability to the facts of this case sets reasonable and predictable limits to this defendant's liability to third parties. However, it does not follow, whatever the practical consequences as among these particular parties, that the proposed expansion of the theory of third-party liability will retain practical limitations in other cases. Once we establish the principle, it will likely detach from these facts. One may reasonably ask under different facts

how we would apply such a principle to limit liability to third parties. If the company has 200 employee-shareholders, do we still dispatch with the requirement that there must be a demonstrable linkage? What if there are hundreds or thousands of nonemployee shareholders? Where does one draw the line? Parsimony in extending *Credit Alliance* would, I think, provide better guidance for accountants and those in relationships with them that fall short of privity. It would be better to adhere to the actual requirement of *Credit Alliance* and our own prior case law that a close linkage between the accountants and the nonclient be established.

Since we are dismissing the complaint, the remaining issues are rendered academic.

Accordingly, the order of Supreme Court, New York County (Beatrice Shainswit, J.), entered January 13, 1999, denying defendant's motion for summary judgment dismissing the complaint, and for costs and attorneys' fees, should be modified, on the law, to the extent of granting the motion to dismiss the complaint, and otherwise affirmed, without costs. Appeal from order, same court and Justice, entered February 17, 1999, granting defendant's motion to quash a subpoena directed to a third-party witness, should be dismissed, without costs, as academic.

ROSENBERGER, J. P. (dissenting in part). Plaintiff asserted various tort claims against defendant, an accounting firm retained by plaintiff's employer Pasadena Capital Corporation (Pasadena) to value plaintiff's minority stock interest when Pasadena exercised its contractual right to buy back his shares. He claims that defendant negligently or fraudulently undervalued his shares by failing to take into account that Pasadena was looking for a buyer for all of its stock. For the reasons below, I would not dismiss plaintiff's negligence claims.

Plaintiff Harold Tod Parrott, currently a resident of New York, was formerly a vice-president, director and 4% shareholder of Pasadena in California. At the time that he left the company, he owned 40,500 shares of Pasadena stock. Prior to a 1997 merger, Pasadena was a privately held California corporation engaged in the business of rendering investment advice. Under a Stock Purchase Agreement between plaintiff and Pasadena (the 1992 Agreement), if Pasadena terminated plaintiff's employment, it had the option to buy back his shares at their fair market value. Since the company was not publicly traded, it was agreed that " 'Fair Market Value' of the Common Stock

shall be as determined, on a minority basis, by an independent third party appraisal conducted in connection with the Company's Employee Stock Ownership Plan." The 1992 Agreement was governed by California law and contained an arbitration clause.

Defendant Coopers & Lybrand was Pasadena's outside auditor. Pursuant to a December 1993 "letter of understanding" between defendant and Pasadena, as of June 30 and December 31 of each year, defendant agreed to "determine the fair market value of 100% of the common stock of [Pasadena], on a minority basis, for Employee Stock Ownership Plan [ESOP] purposes."

Pasadena terminated plaintiff's employment on May 31, 1996. On September 26, 1996, it informed him that it would be exercising the aforementioned call option and that defendant had valued plaintiff's stock at $78.21 per share. That valuation (the June 1996 valuation from Coopers & Lybrand) was transmitted to Pasadena in an October 2, 1996 letter which stated that the valuation was conducted "to determine the fair market value of 100% of the common stock of Pasadena, on a closely-held minority basis, for stock transactions involving employees of the company."

Though the letter did not specifically mention plaintiff or his recent termination, this language and the wording of the contract manifest defendant's awareness that the valuations were performed for this specific limited purpose. The majority's recitation of the facts gives the misleading impression that defendant was hired merely to conduct periodic evaluations of the company for general bookkeeping purposes. Moreover, as the 1993 letter agreement required Pasadena to inform defendant of changes in management, there is at least an issue of fact as to whether defendant knew of plaintiff's May 1996 termination when defendant performed its June 1996 valuation.

In August 1996, plaintiff commenced an action against Pasadena in the United States District Court for the Southern District of New York, seeking to enjoin Pasadena's exercise of its call option. He contended that he had been wrongfully terminated and that therefore he was not obligated to sell back his shares for $78.21 per share. According to plaintiff, Pasadena was actively seeking a buyer for all of its shares at the time he was terminated. If a buyer were found, this would allegedly bring the value of plaintiff's shares close to $120 per share.

The District Court denied plaintiff's motion for an injunction because he had an adequate remedy in damages if his claims had merit. Plaintiff and Pasadena thereupon stipulated that he would sell back his shares at the $78.21 price pursuant to the 1992 Agreement, but without prejudice to his right to assert a wrongful termination claim and seek further remuneration from Pasadena.

In June 1997, Pasadena was merged into Phoenix Duff & Phelps Corporation. Pasadena shareholders allegedly received up to $172.70 per share in the buyout.

Pasadena successfully moved to compel arbitration of plaintiff's remaining claims against it. Arbitration was commenced in July 1998 and is currently pending in California.

In the instant litigation, plaintiff asserted three causes of action against defendant Coopers & Lybrand: professional negligence, negligent misrepresentation, and aiding and abetting a breach of fiduciary duty by Pasadena's majority shareholder. All three are premised on the notion that defendant knew or should have known that Pasadena was actively seeking a buyer in 1996, which would increase the value of the shares beyond the $78.21 figure generated by defendant. Plaintiff claims that higher valuations of Pasadena stock were generated by other appraisers retained by Pasadena in connection with the search for a merger partner.

In December 1998, defendant moved for summary judgment and for an award of costs and attorney's fees pursuant to CPLR 8303-a. Defendant claimed that plaintiff could not prove reliance on the allegedly negligent valuation because he had not seen the accountants' report in which they arrived at that valuation. Defendant placed great weight on plaintiff's response to defendant's notice to admit, in which he stated that he had not even asked to see the report because he could tell that the $78.21 figure was too low on its face. Plaintiff could not have relied on that figure, defendant contended, because he disputed it with Pasadena from the outset.

Defendant also argued that California law should govern because the parties and the subject matter of the action had more contacts with that State. California, unlike New York, does not recognize a cause of action for professional negligence by a nonclient, though it does recognize a negligent misrepresentation claim (*Bily v Arthur Young & Co.*, 3 Cal 4th 370, 406, 834 P2d 745). Furthermore, even if New York law applied, plaintiff was allegedly not within the foreseeable zone of duty under *Credit Alliance Corp. v Arthur Andersen & Co.* (65 NY2d 536).

Noting that discovery was not complete, the IAS Court denied defendant's motion for summary judgment. The court found that issues of fact remained as to whether defendant negligently or willfully ignored an impending sale of Pasadena and the extent to which defendant knew that plaintiff would be bound by defendant's valuation. As these facts were within the moving party's exclusive knowledge and control, the motion was denied. The court also found that plaintiff had shown reliance, in that his employment contract *obligated* him to accept the valuation determined by defendant, whether or not he personally found it credible. Defendant's CPLR 8303-a motion was not addressed, but implicitly denied.

I agree with the majority's conclusion that New York rather than California law should apply. The Court of Appeals has abandoned the traditional conflict-of-laws analysis which invariably applied the law of the State where the alleged tort occurred. Instead, New York courts must apply the law of the jurisdiction that has the most significant interest in the specific issue being litigated (*Babcock v Jackson*, 12 NY2d 473, 481). The interest of the State where both parties are domiciled may outweigh the interest of the State where the tortious conduct happened to occur (*Tooker v Lopez*, 24 NY2d 569, 577).

The Court of Appeals has drawn a distinction between conduct-regulating and loss-allocating legal rules when determining whether situs or domicile should receive greater weight (*Schultz v Boy Scouts*, 65 NY2d 189, 201). Essentially, when the conflict between States' laws involves the appropriate standards of conduct, the law of the situs should typically prevail because that State has the greatest interest in regulating conduct within its borders. By comparison, when the conflict involves rules for allocating losses from admittedly tortious conduct, the situs State's interest is weaker (*Ackerman v Price Waterhouse*, 252 AD2d 179, *lv denied* 1999 NY App Div LEXIS 1068 [1st Dept, Jan. 26, 1999] [mandating application of New York's loss allocation rules where both parties were New York domiciliaries]). "Analysis then favors the jurisdiction of common domicile because of its interest in enforcing the decisions of both parties to accept both the benefits and the burdens of identifying with that jurisdiction and to submit themselves to its authority" (*Schultz v Boy Scouts*, 65 NY2d, *supra*, at 198).

California is the situs of the injury here. On the other hand, New York is the common domicile of both plaintiff and defendant, as defendant has its principal place of business here.

New York has an important interest in applying its own, more favorable laws and policies to protect its domiciliaries who are injured in another State (*Rivera v Pocono Whitewaters Adventures*, 241 AD2d 381). The above is particularly true where, as here, the key difference between New York and California law is not whether defendant's conduct was negligent, but whether plaintiff belongs to a class of persons entitled to sue. This is best understood as a loss-allocating rule, similar to the charitable immunity statute at issue in *Schultz* and the guest motorist statutes analyzed in *Tooker* and *Babcock*. New York law therefore applies to plaintiff's claims in the instant case.

However, I disagree with the majority's application of New York precedent, as well as its interpretation of the facts of this case. Under New York law, the leading case of *Credit Alliance Corp. v Arthur Andersen & Co.* (65 NY2d 536, *supra*) articulates a three-part test for holding accountants liable to nonclient third parties who rely to their detriment on negligently prepared financial reports: "(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance" (*supra*, at 551).

The IAS Court properly found that plaintiff had, in effect, relied on defendant's valuation of his shares by agreeing that this valuation would determine his rights under the employment agreement with Pasadena (*see, Glanzer v Shepard*, 233 NY 236, 238 [since parties to sale contract agreed that price of beans would depend on weight established by third-party weigher, buyer could sue weigher for negligent valuation]). "Where a person is bound to rely on the representations made to him and has no means of controverting them and no means of ascertaining whether or not they are true and made in good faith, it can hardly be said that he has no redress thereafter when at a later date, it becomes evident that the representations were false and fraudulent" (*Alabiso v Schuster*, 273 App Div 655, 658).

Defendant argues that plaintiff should be estopped from claiming reliance. Contrary to defendant's assertion, plaintiff's position in this lawsuit that he was bound by defendant's valuation is not inconsistent with his position in his action against Pasadena. In the latter action, he has always agreed that

Coopers' valuation was meant to be binding on him; however, he claims that he should be relieved of this obligation because Pasadena breached the 1992 Agreement by wrongfully terminating him.

The majority would nonetheless dismiss plaintiff's claims on the ground that there is an insufficient nexus between himself and the accountants. I disagree. As *Credit Alliance* makes clear, the purpose of the "linking" requirement is to show that the accountants somehow acted aware of the plaintiff's reliance. Personal contact between the plaintiff and the accountants is not necessary (*see, Board of Mgrs. of Astor Terrace Condominium v Schuman, Lichtenstein, Claman & Efron*, 183 AD2d 488, 489). In fact, the accountants need not even know the identity of the plaintiff when preparing the financial report; plaintiff need only belong to an identifiable class for whose benefit the report was prepared (*Kidd v Havens*, 171 AD2d 336, 340-341).

The Court of Appeals decision in *White v Guarente* (43 NY2d 356) is directly on point. The general partners of a partnership with about 40 limited partners hired the defendant accounting firm to prepare auditing and tax return services for the partnership. Plaintiffs, the limited partners, brought a malpractice action against the accountant, contending that they had relied on negligently prepared audits and tax returns for the partnership in preparing their own personal tax returns (*supra*, at 359-360). The defendant argued lack of privity.

While recognizing that accountants' liability should not be extended to an indeterminate class of members of the public, the Court of Appeals found sufficient linkage to impose a duty: "Here, the services of the accountant were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit and made up of certain components (see *Ultramares Corp. v Touche*, 255 NY 170, 182-185, *supra*). The instant situation did not involve prospective limited partners, unknown at the time and who might be induced to join, but rather actual limited partners, fixed and determined. Here, accountant Andersen was retained to perform an audit and prepare the tax returns of Associates, known to be a limited partnership, and the accountant must have been aware that a limited partner would necessarily rely on or make use of the audit and tax returns of the partnership, or at least constituents of them, in order to properly prepare his or her own tax returns" (*supra*, at 361). Significantly, nowhere in the decision is it alleged that the

limited partners had direct contact with the accountant. Rather, it was inferred from the terms of the accountant's contract with the partnership that the former should have foreseen plaintiffs' reliance.

The same reasoning should govern the instant case. Defendant Coopers & Lybrand's valuation services were extended to a known group with vested rights, namely current employee-stockholders of Pasadena. As defendant stated in the October 2, 1996 letter to Pasadena, the June 1996 valuation was performed to determine the company's stock value, "on a closely-held minority interest basis, for stock transactions involving employees of the Company." Knowing that Pasadena was not traded on the Stock Exchange and thus had no publicly fixed share price, defendant must have been aware that an employee-stockholder would rely on its valuations when selling back his or her stock (either voluntarily or as the result of a termination and forced buyout).

Though *White* precedes *Credit Alliance*, the Court in *Credit Alliance* took pains to specify that its three-factor test was not to be applied mechanically, nor read to impose additional requirements beyond those set forth in previous cases: "While these criteria permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principles articulated in *Ultramares*, *Glanzer* and *White*, but, rather, they are intended to preserve the wisdom and policy set forth therein" (*Credit Alliance Corp. v Arthur Andersen & Co., supra*, at 551). This clear reaffirmation of *White* contradicts the majority's apparent misconception that the third factor of *Credit Alliance* requires personal contact between plaintiff and defendant.

Subsequent case law applying the *Credit Alliance* test undermines the majority's interpretation. In *Board of Managers* (*supra*), we allowed condominium unit purchasers to bring a negligence action against engineering and design professionals who prepared reports for the condominium sponsor. Even though the identities of the purchasers were not known to the defendants at the time, their intent and understanding was that they were preparing the report so that the sponsor could show it to future purchasers, who would rely on it in making their decision to buy.

In *Kidd v Havens* (*supra*), a title company was potentially liable to a purchaser of property who relied on the title report prepared for the seller. The defendant unsuccessfully moved for summary judgment on the grounds that it had not known

the purchaser's identity, but the Fourth Department deemed the purpose of the privity rule served by the fact that plaintiff was "the only member of a fixed, definite, and identifiable class of potential plaintiffs" (*supra*, at 341).

Similarly, in the instant case, the 1993 letter agreement retaining Coopers & Lybrand instructed it that the report was to be prepared for a specific purpose, i.e., to determine the fair market value of 100% of the common stock of Pasadena, on a closely held minority basis, for ESOP purposes. The facts do not support the majority's assertion that the accountants' preparation of the report was "completely unrelated" to Pasadena's buy-back of plaintiff's shares. Since plaintiff was a member of this clearly circumscribed group for whose benefit the periodic reports were prepared, it does not matter that his name was not mentioned to Coopers & Lybrand.

Moreover, plaintiff was a high-level executive in a small company, who was terminated only a month before Coopers & Lybrand conducted the valuation in question. I therefore cannot accept the majority's ready conclusion that the accountants were ignorant of this change in top management when they performed their analysis. At the least, an issue of fact exists.

The requirement of virtual privity is not meant as a formalistic barrier to recovery, but merely as a way to impose some practical limits on accountants' liability. That purpose is not disserved by allowing plaintiff herein to maintain a cause of action against Coopers & Lybrand, because he was a member of the limited, defined class mentioned in the October 2, 1996 transmittal letter from Coopers & Lybrand to Pasadena, i.e., employee-shareholders who participated in Pasadena's ESOP and were about to engage in transactions with Pasadena regarding those shares. It is worth noting that this company had less than 100 shareholders in all, and all of them were employees. This sets reasonable, predictable limits to defendant's liability to third parties.

I do not share the majority's fears that recognizing accountants' liability in the instant case opens the door to similar claims by an unlimited number of shareholders. As *White* makes clear, the number of potential claimants is less important than whether the group itself is well defined. For instance, in our decision in *Board of Managers* (*supra*), the relevant class was the prospective purchasers of condominium units in a building designed by the defendants. While this class might appear too large and open-ended (potentially including all members of the public), in reality the engineers'

liability was limited to the easily identifiable subset of people who had bought the units. Conversely, if the plaintiff in the instant case had attempted to rely on an all-purpose quarterly report prepared by Coopers & Lybrand for general use by Pasadena, rather than a report specifically commissioned for valuation of employee stock transactions, the fact that he belonged to a small class of stockholders would avail him nothing (*see, Security Pac. Bus. Credit v Peat Marwick Main & Co.*, 79 NY2d 695, 700). Nexus is necessarily a multifactor, case-by-case inquiry. In light of the Court of Appeals' call for flexibility in applying the *Credit Alliance* test, plaintiff's claim should not fail merely because the factors overlap or because the same evidence satisfies more than one prong of the test.

The instant case is distinguishable from those cited by defendant and the majority (*e.g., Security Pac. Bus. Credit v Peat Marwick Main & Co., supra*; *William Iselin & Co. v Mann Judd Landau*, 71 NY2d 420; *Ultramares Corp. v Touche*, 255 NY 170), because there the reports in question were prepared as a general service to the client, rather than for the benefit of a specific class of third parties with whom the client would be dealing in the near future. Evidence of a relationship between the parties is more crucial in such a situation, because the foreseeable reliance of persons like plaintiff is not implied in the very purpose of the report.

The relationship between the prongs of the *Credit Alliance* test should be understood as follows. Where the reports themselves have a more general purpose, independent evidence of linking conduct is necessary. Conversely, where defendant, in making the report, manifested a conscious purpose to benefit the group to which plaintiff belonged, *Credit Alliance* should not be read to require wholly separate additional evidence of linkage. The 1993 letter agreement and the October 2, 1996 transmittal letter from Coopers & Lybrand to Pasadena satisfy both the first and third prongs of the *Credit Alliance* test, because they set forth the parties' intent that persons in plaintiff's position will rely on it and "evince[ ] the accountants' understanding of that party or parties' reliance" (*Credit Alliance Corp. v Arthur Andersen & Co., supra*, 65 NY2d at 551).

An issue of fact exists as to defendant's negligence in setting the value of plaintiff's shares at $78.21 per share. In light of the fact that the company was sold within the year, it cannot be said as a matter of law that due diligence would have failed to disclose that Pasadena was "in play" in mid-1996. On the other hand, defendant points out that the valuation method

used to assess plaintiff's minority interest explicitly excluded any control premium that a buyer might pay to obtain the entire company. This control premium, defendant contends, explains the higher price eventually received by some shareholders in 1997. While this theory is plausible, it would be premature for the Court to accept it before discovery is complete. However, plaintiff's third cause of action for aiding and abetting breach of fiduciary duty rests merely on conclusory allegations which do not suffice to sustain a cause of action (*National Westminster Bank USA v Weksel*, 124 AD2d 144, 149, *lv denied* 70 NY2d 604). Defendant cannot be held liable for another's intentional tort "unless the circumstances of his connection therewith can be alleged in detail from the outset" (*National Westminster Bank USA v Weksel*, *supra*, at 149). Therefore, I would sustain only those causes of action that sound in negligence.

Motions seeking costs, attorneys' fees and other related relief denied.

WILLIAMS, WALLACH and BUCKLEY, JJ., concur with TOM, J.; ROSENBERGER, J. P., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered January 13, 1999, modified, on the law, to the extent of granting the motion to dismiss the complaint, and otherwise affirmed, without costs. Appeal from order, same court, entered February 17, 1999, dismissed, without costs, as academic. Motions seeking costs, attorneys' fees and other related relief denied.